HENRY L. ROBY,

        **Plaintiff,**

v.                              **Civil Action No. 1:04CV161**
                                **(Judge Irene M. Keeley)**

JO ANNE B. BARNHART,
Commissioner of Social Security,

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner," sometimes "Defendant") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision of Plaintiff's "Motion for Judgment on the Pleadings" and Defendant's "Motion for Summary Judgment" and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

### I. Procedural History

Plaintiff applied for SSI and DIB on February 12, 2002, alleging disability from August 24, 2001, due to degenerative discs, bulging disc, and shoulder and neck pain (R. 15-16, 59-61, 68, 73, 277-79). The state agency denied the claim initially and upon reconsideration (R. 40-49, 280-88). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Donald McDougall held on April 22, 2003, in Morgantown, West Virginia, and at which Plaintiff, who was represented by Montie VanNostrand, Esquire, and Dr. Larry Ostrowski, a vocational expert ("VE"), testified (R. 294-343).

On June 24, 2003, the ALJ issued a decision finding Plaintiff was not disabled (R. 12-23). Subsequent to the ALJ's finding, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5-8).

## II. Statement of Facts

Plaintiff, who was born on April 26, 1950, and was fifty-three (53) years of age at the time of the ALJ's decision, graduated from high school, and his past work experience included carpenter assistant, laborer, and logger (he felled trees) (R. 82, 298). Plaintiff reported he ceased working on September 14, 2001, "because of pain" (R. 73).

On December 15, 1998, Plaintiff reported to the Braxton Community Health Center, located in Gassaway, West Virginia, with a hand injury caused by a motor vehicle accident. His neck was supple with a full range of motion (R. 194).

On December 22, 1998, Plaintiff returned to the Braxton Community Health Center and reported his neck was stiff, his back went out when he stood, and his knee was painful and swollen. It was noted that Plaintiff did not report these injuries at the December 15, 1998, visit. The examining physician noted cervical spine tenderness and diagnosed cervical myofascial strain (R. 193).

On January 21, 1999, Plaintiff was examined by Goutam Shome, M.D., of the Braxton Community Health Center. Plaintiff reported "some pain in the left knee with movements." Dr. Shome observed "mild tenderness in the medial aspect of the left knee, no swelling, or redness or deformity." Plaintiff's range of motion in the left knee was normal (R. 191).

On February 3, 1999, Plaintiff was again examined at Braxton Community Health Center. The range of motion of his left knee was decreased and positive point tenderness medial left knee and medial suprapatellarly with sharp/dull pain were noted (R. 190).

2

On October 26, 1999, Plaintiff presented to Paul Lattimer, D.C., whose practice was located in Weston, West Virginia, and complained of low back and right leg pain because he had "twisted self" the previous day. Dr. Lattimer diagnosed acute lumbar sprain/strain (R. 119).

On November 24, 1999, Plaintiff reported to Braxton Memorial Hospital and reported pain in his left shoulder caused by a "tree limb kicking back and hitting the shoulder" (R. 120). Normal motor and sensory function, normal proximal and distal joint, no tendon injury, and full range of motion were observed. The physician diagnosed a left shoulder contusion (R. 122).

On August 24, 2001, Plaintiff's alleged onset date, Plaintiff reported to Carroll County General Hospital, located in Westminster, Maryland, with complaints of neck and lower back pain due to his involvement in an automobile accident on that same date. The examination of Plaintiff revealed his neck was supple and non tender, his extremities were not tender or swollen, and his range of motion and stability were normal. Plaintiff's back and neck were tender, but without spasms. The physician diagnosed cervical strain/sprain and low back strain (R. 271)-72). An x-ray of Plaintiff's cervical spine on that date revealed no cervical spine fracture or subluxation and mild cervical spondylosis (R. 274).

On September 24, 2001, Plaintiff visited Elk River Chiropractic Center, and was examined by W. D. Lohr, D.C. Dr. Lohr noted Plaintiff's restrictions included sitting, bending, lifting, flexion, extension, and computer work (R. 177). On September 26, and September 28, 2001, Plaintiff visited Elk River Chiropractic Center for treatment of headaches and pain in his upper neck, lower neck, upper back, shoulder, mid back, and low back (R. 189).

On October 1, 2001, Plaintiff again visited Elk River Chiropractic Center for treatment. It was noted that Plaintiff continued "to progress" (R. 176). On October 3, October 5, October 8, October 10, October 12, October 15, October 17, October 19, October 22, October 26, October 29, and November

3

2, 2001, Plaintiff was treated at Elk River Chiropractic Center for upper, mid-, and lower back pain and headaches (R. 170-75).

John Anton, M.D., read the November 6, 2001, MRI of Plaintiff's cervical spine. He noted "normal vertebral body height and alignment present without evidence for acute fracture, dislocation or subluxation . . . no evidence for significant disc bulge or disc herniation . . . [no] evidence for spinal stenosis . . . [and] normal signal seen within the spinal cord and exiting nerve roots." Dr. Anton's impression was of a normal MRI of Plaintiff's cervical spine (R. 181).

Plaintiff was treated at the Elk River Chiropractic Center on November 9 and November 12, 2001 (R. 167, 169).

Dr. Anton read the November 13, 2001, MRI of Plaintiff's lumbar spine. He found "asymmetric disc bulge at L4-5 on the left with mild narrowing of the left nueral foramina" and "small annular fissure at L5-S1 . . . [and] no evidence for canal stenosis at this level" (R. 182).

On November 14, November 16, and November 30, 2001, Plaintiff visited Elk River Chiropractic Center for treatment (R. 165-67).

On December 3, 2001, Dr. Lohr completed an "Attending Physician's Disability Certification Return to Work Recommendations," noting therein that Plaintiff was disabled and unable to work from September 24, 2001, to January 4, 2002 (R. 164).

Plaintiff was treated at the Elk River Chiropractic Center on December 5, December 10, December 21, 2001, January 9, and January 10, 2002 (R. 161-63). At Plaintiff's January 14, 2002, treatment at Elk River Chiropractic Center, it was noted that his "neck and shoulder much improved." Dr. Lohr opined Plaintiff was disabled and should not work to February 4, 2002 (R. 160-61).

On January 18, January 21, January 25, January 30, February 8, February 13, and February 18,

4

2002, Plaintiff sought chiropractic treatment at Elk River Chiropractic Center (R. 156-59).

Plaintiff sought treatment at the emergency department of Braxton County Memorial Hospital on February 20, 2002, for low back and neck pain (R. 235). The examining physician noted Plaintiff was in acute pain and moderate distress. His neck was supple and there was no "JVD," no thyromegally, no tenderness, or no bruits in the neck. Plaintiff's gait and spine were normal. The doctor diagnosed "chronic lumbar pain" (R. 236).

On February 22, 2002, Plaintiff was treated at the Elk River Chiropractic Center, and Dr. Lohr opined that Plaintiff was disabled and unable to return to work until March 18, 2002 (R. 155).

Plaintiff sought chiropractic treatment at Elk River Chiropractic Center on February 25, February 27, March 1, and March 13, 2002 (R. 153-54).

On March 6, 2002, Plaintiff presented with low back pain to the Braxton Community Health Center and was seen by Joe Boyce, D.O. Plaintiff informed Dr. Boyce that the manipulation provided by Dr. Lohr "temporarily" eased his pain.. Dr. Boyce diagnosed lumbar strain and prescribed Lortab 5/500 and Restoril 7.5 mg (R. 189).

Plaintiff underwent treatment for low back pain at the Elk River Chiropractic Center on March 20, 2002 (R. 152). A "Physician's Summary" was provided to the West Virginia Department of Human Services" by Dr. Lohr of Plaintiff on that same date, in which he listed Plaintiff's diagnosis as "cervical sprain/strain, injury to cervical nerves, injury to dorsal nerves, lumbar sprain/strain." He listed Plaintiff's prognosis as "fair" and opined Plaintiff was temporarily totally disabled until May 20, 2002 (R. 226).

Plaintiff received chiropractic treatment at the Elk River Chiropractic Center on March 22, March 25, March 27, April 1, April 3, April 5, April 8, and April 12, 2002 (R. 148-52).

On April 12, 2002, Plaintiff was examined by Dr. Boyce at Braxton Community Health Center

for an injury he sustained to his back from "cleaning cow manure out of yard." He observed Plaintiff appeared "comfortable." Dr. Boyce diagnosed somatic dysfunction and lumbar strain and prescribed Lorcet 5/500 and Restoril 15mg (R. 188).

Plaintiff underwent chiropractic treatment at the Elk River Chiropractic Center on April 12, April 15, April 19, April 26, April 29, May 5, 2002. At his May 8, 2002, treatment, it was noted Plaintiff was "doing much better" (R. 145-48).

On May 25, 2002, Arturo Sabio, M.D., completed a physical evaluation of Plaintiff. The physical evaluation revealed that Plaintiff was five (5) feet, eight (8) inches tall, weighed 185 pounds, and had visual acuity was 20/20 on the right and 5/200 on the left without corrective lenses. His HEENT, neck, cardiovascular, chest functions, abdomen, extremities, spinal curvature, and neurological examinations were normal. Plaintiff's spinous processes of spine were tender, and no kyphosis or scoliosis were observed (R. 126-27). The range of motion examination of Plaintiff revealed the following: 1) cervical – lateral flexion was 45 degrees bilaterally, flexion was 60 degrees, extension was 75 degrees, and rotation is 80 degrees bilaterally; 2) shoulders – abduction was 180 degrees bilaterally, forward flexion was 180 degrees bilaterally; adduction was 50 degrees bilaterally, internal rotation was 40 degrees bilaterally and external rotation was 90 degrees bilaterally; 3) elbows – flexion was 150 degrees bilaterally, extension was 0 degrees bilaterally, supination was 80 degrees bilaterally, and pronation was 80 degrees bilaterally; 4) wrists – dorsiflexion was 60 degrees bilaterally, palmar flexion was 70 degrees bilaterally, radial deviation was 20 degrees bilaterally, and ulnar deviation was 30 degrees bilaterally; and 5) hands – all joints allow 90 degrees of flexion bilaterally and zero degrees of extension (R. 126).

Dr. Sabio diagnosed degenerative disc disease, and chronic back pain, and "probably"

amblyopia[1] of the left eye. In his summary, Dr. Sabio opined Plaintiff's gait was normal, he did not require any aid in ambulation, and he was stable at station. Plaintiff could, according to Dr. Sabio's opinion, "walk on the heels, on the toes and heel-to-toe and tandem . . . stand on either leg separately . . . squat fully." Dr. Sabio observed tenderness of lumbar spine and that Plaintiff stated he experienced "pain in the lumbar spine on straight leg raising." He noted Plaintiff "did not want to go beyond 45 degrees of straight leg raising on either side because of the pain in the lumbar spine" and "was able to flex his hips to 100 degrees bilaterally with pain in the lumbar spine." Dr. Sabio opined Plaintiff's "range of motion [was] otherwise normal in the rest of the joints of the spine and the upper and lower extremities," as were his deep tendon reflexes and sensory and motor abilities (R. 127).

Plaintiff was treated at Elk River Chiropractic Center on May 29, and June 3, 2002 (R. 144).

On June 6, 2002, Thomas Lauderman, D.O., a state agency physician, completed a Physical Residual Functional Capacity Assessment (RFC) of Plaintiff for back pain syndrome and shoulder pain syndrome. He found Plaintiff could occasionally lift and/or carry fifty (50) pounds, frequently lift and/or carry twenty-five (25) pounds, stand and/or walk for a total of about six (6) hours in an eight (8) hour workday, sit with normal breaks for a total of about six (6) hours in an eight (8) hour workday, and push and/or pull unlimited (R. 130). Dr. Lauderman found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (R. 131-33). Dr. Lauderman determined Plaintiff's RFC to be for medium exertional work (R. 129-34).

On June 7, June 12, June 16, June 21, June 26, July 1, July 8, July 15, July 17, July 19, and July 22, 2002, Plaintiff was treated at the Elk River Chiropractic Center for back and neck pain (R. 138-43).

---

[1] Amblyopia: impairment of vision without detectable organic lesion of the eye. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 57.

On July 22 and July 26, 2002, Plaintiff received chiropractic treatments from Dr. Lohr (R. 219).

On July 29, 2002, Dr. Boyce completed a "General Physical" of Plaintiff and reported those findings to the West Virginia Department of Health and Human Resources. The results were normal for Plaintiff's neck, neurological, orthopedic, and arteriosclerosis examinations. Dr. Boyce opined Plaintiff's vision was 20/30 in his right eye and 20/200 in his left without corrective lenses (R. 227). Dr. Boyce major diagnosis was for chronic back pain and blurred vision and minor diagnosis was for hemorrhoids. He opined Plaintiff could perform sedentary full time work at light duty (R. 228).

Plaintiff was provided chiropractic treatments by Dr. Lohr on August 19, 2002, at which time it was noted that Plaintiff felt "not too bad, neck much better again" (R. 218).

On August 21, 2002, a "Routine Abstract Form Physical" was completed by Dr. Boyce of Plaintiff for an examination conducted on August 6, 2002. Dr. Boyce found Plaintiff's gait and station, fine motor ability, gross motor ability joints of all extremities, and muscle bulk as normal. He opined that Plaintiff's range of motion in his back and neck were abnormal. Dr. Boyce's examination revealed Plaintiff's reflexes, sensory deficits, motor strength, coordination, frequency of seizures, and mental status were normal (R. 184).

Plaintiff received chiropractic treatments from Dr. Lohr on the 23rd and 28th of August, 2002 (R. 218, 220).

On August 30, 2002, Cynthia Osborne, D.O., a state agency physician, completed a RFC of Plaintiff. She opined that Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 198). She found no postural, manipulative, visual, communicative, or environmental limitations

8

for Plaintiff (R. 199-201). Dr. Osborne opined Plaintiff's RFC was for medium work (R. 202).

Plaintiff received chiropractic treatment from Dr. Lohr on September 6, September 13, September 18, September 23, September 30, October 4, October 9, October 14, and October 21, 2002 (R. 214-217, 220).

On October 28, 2002, Plaintiff was treated by Dr. Boyce for his lumbar disc and insomnia. Plaintiff stated he was "still having lumbar pain," but that he had experienced "some relief from chiropractor" and Lortab. Plaintiff informed Dr. Boyce he had been sleeping "better" with Restoril. Dr. Boyce observed Plaintiff to be "comfortable." Plaintiff's neck presented "no lymphadenopathy." Dr. Boyce diagnosed lumbar disc disease and prescribed Lorcet 10/650 and Restoril 30mg (R. 208).

On November 1, 2002, Plaintiff underwent chiropractic treatments with Dr. Lohr. It was noted Plaintiff was "doing fair" (R. 213). Also on that date, Plaintiff had a follow-up visit with Dr. Boyce relative to his laboratory test results, which resulted in Dr. Boyce's diagnosis of "new onset" diabetes mellitus, Type 2.[2] Plaintiff informed Dr. Boyce that he suffered from erectile dysfunction. Dr. Boyce prescribed Avandia 4mg, Glucotrol XL, and Viagra (R. 207).

Plaintiff was provided chiropractic treatments by Dr. Lohr on November 6, November 11, November 15, November 20, December 2, and December 9, 2002 (R. 210-13).

On December 12, 2002, Dr. Boyce completed a "General Physical" form for the West Virginia Department of Health and Human Resources of Plaintiff's "back problem and sugar." He noted Plaintiff's distant vision without glasses was 20/25 in his right eye and 20/200 in the left eye. The results

---

[2] d. mellitus, Type II: one of the two major types of diabetes mellitus, characterized by peak age of onset between 50 and 60 years, gradual onset with few symptoms of metabolic disturbance (glycosura and its consequences), and no need for exogenous insulin; dietary control with or without oral hypoglycemics is usually effective. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 489.

of Plaintiff's neck examination was normal. Plaintiff's neurological examination revealed no "pupilar response to direct light of OS," and his orthopedic examination revealed a decreased range of motion of his back (R. 224). Dr. Boyce noted Plaintiff experienced "diffuse low back pain," and he diagnosed lumbar disc disease and acute monocular blindness (major) and type 2 diabetes (minor). Dr. Boyce opined Plaintiff could not lift more than ten (10) pounds or climb heights and that he lacked depth perception. It was the opinion of the doctor that Plaintiff would be unable to work full time for more than one (1) year. Dr. Boyce recommended Plaintiff undergo an MRI of his head, cervical spine, and lumbar spine and that his treatments should include analgesics and hypoglycemics (R. 225).

On the 16th and 20th of December, 2002, Plaintiff was treated by Dr. Lohr (R. 209-10).

On January 20, 2003, Plaintiff was examined by Dr. Boyce. Plaintiff reported "his neck and back [had] been bothering him." Dr. Boyce noted Plaintiff's "accu" check revealed his blood sugar was at 221. He diagnosed type 2 diabetes, somatic dysfunction, and monocular blindness and prescribed Glucotrol 5mg (R. 232).

On February 18, 2003, Plaintiff again visited Dr. Boyce with complaints of his "back still bothering him" and "still . . . having [left] eye blindness." Dr. Boyce referred Plaintiff to John K. Lackey, D.O., F.A.A.O., whose ophthalmology practice was located in Summersville, West Virginia, and scheduled an appointment for Plaintiff on March 3, 2003 (R. 231).

Dr. Lackey performed an eye examination of Plaintiff on March 3, 2003. Plaintiff's vision was assessed as 20/20 in the right eye and 20/400 in the left eye (R. 239). The cause of Plaintiff's diminished left-eye vision was cataracts (R. 240). Dr. Lackey scheduled surgery for March 25, 2003 to remove those cataracts. A notation on Dr. Lackey's office record reads Plaintiff "cancelled surgery . . . will reschedule – he spoke to hospital" (R. 239).

On March 11, 2003, a psychological evaluation was completed of Plaintiff at the request of Plaintiff's counsel. The examiner was Frances Allen-Henderson, MA, LSW, and the supervisor was L. Andrew Steward, Ph.D., both licensed psychologists. Plaintiff stated he had experienced "'lower back neck problems,'" "'bulging discs in the neck and back and has migraine headaches as a result,'" diabetes, and was had been "legally blind in his left eye" for two years. Pain medication, according to Plaintiff, "'takes the edge off the pain'" (R. 242).

Plaintiff stated he had sought treatment in the late 1970's "for his 'nerves' and 'being depressed from the first marriage.'" Plaintiff informed the examiner that he had never been hospitalized for any emotional condition, he had been prescribed "'Mellaril and Elavil' in the past," there was a "positive history of 'physical abuse' in the home," he had never attempted suicide, he had thoughts of suicide, he felt "'worthless,'" Temphazine is the medication currently prescribed for him, and his family history was positive for "'anxiety and mental retardation.'" Plaintiff stated he first used drugs when he was sixteen (16) years of age and that he used "'any kind of drugs and alcohol' on a regular basis." According to Plaintiff, "substances" were used "'every day.'" Plaintiff admitted to using drugs and alcohol for eighteen (18) years, to attending AA meetings "'off and on,'" and overdosing and/or experiencing withdrawal symptoms (R. 244).

Plaintiff stated his social activities and daily activities included attending church "'two or three times per week,'" completing his personal hygiene needs, and preparing "'simple meals.'" Plaintiff informed the examiner that he could not participate in outdoor activities, did not enjoy social or recreational activities, felt as though he did "'not belong around people,'" and had a "'difficult time meeting new people.'" Plaintiff reported he could not perform strenuous chores, could complete light chores with frequent breaks for pain, could not drive because of his diminished vision, could sleep for

11

"'three to four hours . . . per night due to pain'" and that "'the medication helps some,'"could not concentrate or focus, and had little energy. Plaintiff stated that he was not "'satisfied'" with his life and if he could live it over, he "'wouldn't abuse my body so much'" (R. 245).

The examiner observed Plaintiff's pace to be "significantly slower than average"; "rapport was . . . easily maintained"; eye contact was average; psychomotor activity was very low; Plaintiff was "oriented in five spheres"; Plaintiff's speech "was relevant, coherent, and connected"; Plaintiff's immediate memory was below average; his short term memory "was slightly below average"; attention was above average; concentration was "slightly below average"; observed mood was depressed; affect was anxious and depressed; Plaintiff's social judgment was average (R. 245).

Plaintiff's results on the Wechsler Adult Intelligence Scale – Revision III (WAIS-III) were as follows: 1) Verbal IQ – 97; 2) Performance IQ – 74; 3) Full Scale IQ – 86; 4) Verbal Comprehension Index – 89; and 5) Perceptual Organization Index – 76 (R. 246). The results of the Wide Range Achievement Test-Revision Three (WRAT3) for Plaintiff were as follows: 1) Reading – fourth grade; 2) Spelling – third grade; and 3) arithmetic – high school (R. 247). The examiner administered the Minnesota Multiphasic Personality Inventory – Revision Two (MMPI-2) and found the following: Plaintiff may 1) suppress or deny psychological problems; 2) not profit from past experiences; 3) have difficulty establishing rapport with others; 4) experience anxiety in social settings; 5) demonstrate difficulty interacting with members of the opposite sex; and 6) feel he does not "fit in" with others. The results of the Beck Depression Inventory – Revision Two (BDI-II) was a score of 21, which indicated "moderate depression" (R. 248). The results of the Beck Anxiety Inventory (BAI) was a score of 29, which indicated "severe anxiety." The results of the Beck Hopelessness Survey (BHS) was a score of 20, which indicated "severe hopelessness." The results of the Bender Visual Motor Gestalt Test

(BVMGT) "suggest problems with neurological functioning" (R. 249).

The examiner's diagnostic impressions were as follows: 1) Axis I – major depressive disorder, recurrent, moderate; 2) Axis II – deferred; 3) Axis III – review of medical record; 4) Axis IV – occupational problems; and Axis V – 56 (R. 249-50). The following recommendations were made: Plaintiff should 1) "seek mental health treatment"; 2) "learn and utilize deep breathing/relaxation and new coping skills"; and 3) "continue to seek medical treatment and perhaps referral to a pain management center would be helpful" (R. 250).

Ms. Allen-Henderson and Dr. Steward completed a "Mental Residual Functional Capacity Assessment of Work Related Abilities" of Plaintiff on March 5, 2003. Plaintiff was found to exhibit moderate limitations in understanding, remembering, and carrying out short or detailed instructions. Plaintiff presented no limitations in his ability to exercise judgment or make simple work related decisions (R. 251). The examiner found Plaintiff would be slightly limited in his ability to sustain attention and concentration for extended periods, moderately limited in his ability to maintain regular attendance and punctuality, and moderately limited in his ability to complete a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks. Plaintiff was found to be moderately limited in his ability to interact appropriately with the public and slightly limited in his ability to respond properly to direction and criticism from his supervisors and work in coordination with others without being unduly distracted by them (R. 252). The examiner found the following: 1) no limitations to Plaintiff's ability to maintain acceptable standards of grooming and hygiene; 2) slight limitations to Plaintiff's ability to work in coordination with others without unduly distracting them, to demonstrate reliability, and to be able to ask simple questions or request assistance; and 3) moderate limitations to

Plaintiff's ability to maintain acceptable standards of courtesy and behavior and relate predictably in social situations in the workplace. Plaintiff was found to exhibit slight limitations in his ability to respond to changes in the work setting and to be aware of normal hazards (R. 253). It was found Plaintiff demonstrated moderate limitations in his ability to tolerate ordinary work stress. Ms. Allen-Henderson and Dr. Steward opined that Plaintiff's limitations had existed since September, 2001 (R. 255).

A Psychiatric Review Technique was also completed of Plaintiff by Ms. Allen-Henderson and Dr. Steward. It was noted Plaintiff had no organic mental disorders; schizophrenic, paranoid, and other psychotic disorders; mental retardation; anxiety-related disorders; somatoform disorders; personality disorders, substance addiction disorders, or autism and other pervasive disorders (R. 256-57, 259-65). It was noted that Plaintiff did have affective disorders in the form of depressive syndrome, which was characterized by sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, or thoughts of suicide (R. 259). The examiner found the following degrees of limitations as to Plaintiff's functionality: 1) mild restrictions to activities of daily living; 2) moderate difficulties in maintaining social functioning; 3) moderate difficulties in maintaining concentration, persistence, or pace; and 4) three repeated episodes of decompensation, each of extended duration (R. 266).

On March 18, 2003, Plaintiff was examined by Dr. Boyce; his blood sugar was registered at 258. Plaintiff informed Dr. Boyce that his monocular blindness was caused by a cataract, which was to be surgically removed. Dr. Boyce diagnosed type 2 diabetes, low back pain, diabetic neuropathy (R. 230).

At the administrative hearing on April 22, 2003, Plaintiff testified he could not work because he experienced "chronic lower back and neck pains and headaches and . . . problems in my hands" (R.

14

298). Plaintiff stated the chiropractic treatments he had received "helped" his condition and that the treatments and medications he received from Dr. Boyce "help me with the pain and to help me sleep at night" (R. 299). He stated the pain medication reduced the pain to a "five or six" on a scale of zero to ten (R. 321). Plaintiff testified that he had been prescribed hydrocodone, Temphazine, Avandia, and Amaryl and that the Avandia and Amaryl caused his blood sugar to reduce "almost 100 points" (R. 300). According to Plaintiff, he had never been provided a "special diet for the diabetes" (R. 301).

Plaintiff testified that the pain in his neck and back was constant. He stated he could not sit or stand for "too long" (R. 301). Plaintiff stated that, even though he had never attempted, he could "probably not" walk for one mile on level ground. Plaintiff testified he could sit for one hour, stand for one-half hour, and that staying in one position too long made Plaintiff's back pain worsen (R. 302, 304). Plaintiff stated he could lift a gallon of milk and was experiencing difficulty making a fist with his hand. Plaintiff could, however use eating utensils and grasp cups and glasses (R. 303-04). He testified that he was "legally blind in his left eye" because of a cataract, he could continue to drive, and he intended to have the cataract surgically removed within the next thirty (30) to sixty (60) days (R. 305-07). Plaintiff stated he experienced headaches in the "back of the head . . . every other day" (R. 317).

Plaintiff testified that his activities of daily living were sitting in a recliner for six (6) to eight (8) hours per day, watching television, visiting his brother, and visiting a friend at a garage (R. 307, 312, 320). Plaintiff stated he could bathe and dress himself (R. 308). Plaintiff informed the ALJ that he attended church services two (2) or thee (3) times per week, and each service lasted for one (1) hour. He also stated he ate in restaurants "once in a while" (R. 312). Plaintiff testified he had gone deer hunting the previous summer one (1) time and had fished the previous summer two (2) times (R. 313). He also stated he had shoveled cow manure approximately one (1) year earlier and had lifted a log of

15

wood approximately one (1) month earlier (R. 308-10).

Plaintiff also testified at the administrative hearing that he experienced depression and anxiety, for which he had not sought treatment and did not take medication. He stated these conditions affected his ability to function in that he could not "stay focused" (R. 310-11, 327).

The ALJ, at the administrative hearing, asked the VE if jobs existed in the economy for a person of Plaintiff's age, education, and work experience, who was limited to medium exertional work that did not require good depth perception, peripheral vision, driving, travel, reading above a fourth grade level, writing above a third grade level, or significant workplace hazards like heights or dangerous machinery; that allowed the individual to change positions for a couple minutes every hour; that involved simple one to three-step tasks with no interaction with the general public, no close interaction with supervisors or co-workers, no fast paced or assembly line work, no hard deadlines or quotas; and that would allow a person to miss up to two days of work a month and provide initial supportive supervision (R. 330-31). The vocational expert testified that such an individual could perform work which existed in significant numbers in the national economy at the light and medium exertional levels, including commercial cleaner, equipment washer, mail clerk, and housekeeping cleaner (R. 332).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ McDougall made the following findings:

1.     The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.     The claimant has an impairment or a combination of impairments considered

16

"severe" based on the requirements in the Regulations (20 CFR §§ 404.1520(b) and 416.920(b)).

4.    The medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's testimony and allegations partially credible except regarding the severity of the claimant's impairments and symptoms and their effect on his functional abilities.

6.    The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.    The claimant has the following residual functional capacity: he is able to lift up to 50 pounds of weight and engage in a good deal of standing, walking, and sitting; perform jobs not requiring good depth perception or good peripheral vision; work not requiring driving or traveling as part of the job; jobs allowing him to change positions briefly for one to two minutes at least every hour; jobs not requiring reading or writing above a third grade level; jobs not involving significant workplace hazards such as heights or dangerous moving machinery; unskilled jobs involving simple one to three step job tasks; jobs not involving work with the general public or close interaction with co-workers or supervisors; jobs not involving fast-paced or assembly line work; modestly flexible work without hard deadlines or quotas; jobs allowing for up to two days absent per month; and jobs with initial supportive supervision.

8.    The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

9.    The claimant is an "individual closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963).

10.    The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

11.    The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

12.    The claimant has the residual functional capacity to perform a significant range of medium work (20 CFR §§ 416.967).

13.    Although the claimant's limitations do not allow him to perform the full range of medium work, using Medical-Vocational Rule 203.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a commercial

cleaner, equipment washer, mail clerk, and janitor.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

The Plaintiff contends in his brief:[3]

_____

[3] Plaintiff's failed to adhere to LR 18.12(f) relative to the format of the submitted brief. The undersigned would return to Plaintiff said brief for resubmission but for the fact that said brief was filed prior to the May 10, 2005, hearing. At the May 10 hearing, the Court admonished Plaintiff's counsel relative to a number of areas of noncompliance. Counsel admitted

1. "The ALJ failed to consider the combined effect of the Plaintiff's multiple physical and mental impairments, nor did he consider the synergistic effect of Plaintiff's combined impairments and the effects thereof on his ability to work on a sustained basis in any job within the regional and national economy, as required by the Court in the case of Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986); Alderman v. Chater, 40 F.Supp.2d 367 (N.D.W.Va. 1998); Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984) (quoting Appeals Council Review of Sequential Evaluation Under Expanded Vocational Regulations (1980); DeLloatche v. Heckler, 715 F. 2d 148 (4th Cir. 1983); and Walker v. Bowen, 889 F.2d. 47 (4th Cir. 1988)."

2. "There is a lack of substantial support for Step One of the ALJ's credibility analysis pursuant to SSR 96-7p in that he found [Plaintiff] suffered from conditions which were not reasonably likely to produce the symptoms to the degree alleged."

3. "The ALJ improperly substituted his own opinion for that of qualified medical and mental health professionals, totally discounted the treating physician's opinion who had examined the Plaintiff and treated him for a number of years, was familiar with the Plaintiff and was witness to his decline in functional ability and emotional well being, completely ignored the opinion evidence by the examining psychologist. The ALJ should have properly followed the mandates set forth in SSR 96-2p, 96-6p and specifically 96-5p which states within the Requirements for Recontacting Treating Sources, 'Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.' 20 C.F.R. 416.912, 404,1512; Lewis v. Weinberger, 541 F.2d 417, 421 (4th Cir. 1976)."

4. "There is a lack of substantial evidentiary support for the RFC found by the ALJ in his decision, in that the ALJ impermissibly omitted without explanation the specific mental limitations identified by the examining psychologist."

5. "The ALJ relied upon an incomplete and inadequate hypothetical question to the VE and ignored favorable testimony of the VE ruling out all work on the basis of mental limitations identified by the examining psychologist and physical limitations identified by the treating physician in violation of the Commissioner's regulations and the law of the circuit."

---

shortcomings in office procedures which had permitted such failures to occur. The Court trusts that pleadings filed after the May 10, 2005, hearing will comply with the Rules.

The Defendant contends:

1. The ALJ properly considered Plaintiff's impairments individually and in combination.

2. The ALJ properly determined that Plaintiff was not entirely credible.

3. The ALJ properly considered the opinions of the examining medical sources.

4. The ALJ's RFC assessment and hypothetical question to the vocational expert accommodated all of Plaintiff's limitations that were supported by the record.

## C. Combined Effects of Impairments

Plaintiff contends "the ALJ failed to consider the combined effect of the Plaintiff's multiple physical and mental impairments, nor did he consider the synergistic effect of Plaintiff's combined impairments and the effects thereof on his ability to work on a sustained basis in any job within the regional and national economy, as required by the Court in the case of Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986); Alderman v. Chater, 40 F.Supp.2d 367 (N.D.W.Va. 1998); Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984) (quoting Appeals Council Review of Sequential Evaluation Under Expanded Vocational Regulations (1980); DeLloatche v. Heckler, 715 F. 2d 148 (4th Cir. 1983); and Walker v. Bowen, 889 F.2d. 47 (4th Cir. 1988)." The Defendant contends the ALJ properly considered Plaintiff's impairments individually and in combination.

The Fourth Circuit has held, in *Alderman v. Chater*, 40 F. Supp. 2d, 367, that "[i]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an administrative law judge (ALJ) must consider the combined effect of a social security disability claimant's impairments. Social Security Act, § 223(d)(2)(C), as amended, 42 U.S.C.A. 423(d)(2)(C); 20 C.F.R. § 404.1523." Additionally, the Court held, in *Cook v. Heckler*, 783 F.2d 1168, 1174 (1986) that "the Secretary must evaluate the combined severity of multiple impairments 'without regard to whether any such impairment, if considered separately, would be of sufficient severity.' Moreover, the

Secretary must make a specific and well-articulated finding as to the effect of the combination of impairments." See also *Walker v. Bowen*, 889 F.2d, 47; *DeLloatche v. Heckler*, 715 F.2d 148 (4th Cir. 1983); *Oppenheim v. Finch*, 495 F.2d 396, 398 (R. 1974).

The ALJ in the instant case did consider the combined effects of Plaintiff's impairments in determining whether those impairments were of sufficient severity to prohibit basic work-related activities, *Alderman, supra*. In his decision, the ALJ found, at step one of the sequential analysis, that "[t]he claimant has not engaged in substantial gainful activity since his alleged onset date; and at step two, the ALJ found as follows:

> The medical evidence indicates that the claimant has a vertebrongenic[4] disorder, diabetes mellitus, left eye blindness, depression, and anxiety, impairments that, at least in combination, are "severe" within the meaning of the Regulations, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (R. 17).

At step three, the ALJ decided as follows:

> The claimant has alleged depression and anxiety that are evaluated under listing sections 12.04 and 12.06 of Appendix 1. However, the claimant does not require treatment from a mental health professional. Sections 12.04B and 12.06B require an evaluation of psychiatric functional limitations with marked or extreme functional limitations in at least two functional categories. The first functional category involves restriction of activities of daily living. The undersigned finds that the claimant has only mild limitation in his functional category. The claimant is independent with activities of daily living, and he is able to perform activities outside his home. The next functional category involves difficulties in maintaining social functioning. The claimant may have moderate limitation in this function category; however, the psychological examination did not note any severe problems involving social functioning (Exhibit 14F). [Plaintiff] is able to perform activities outside his home requiring interactions with others. The undersigned finds that the claimant may have mild limitations involving concentration, persistence, or pace. Dr. Steward indicated that the claimant had above average attention and slightly below average concentration (Exhibit 14F, page 5). The claimant also had a verbal IQ score of 97.

---

[4] Vertebrogenic: arising in a vertebra or in the vertebral column. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 1959.

There is no indication that the claimant would be unable to perform at least unskilled job tasks. Additionally, there have been no documented episodes of decompensation of extended duration, despite the contrary notation of Dr. Steward. . . . In summary, the claimant does not have any marked or extreme functional limitations. His impairments also do not meet the "C" criteria requirements of Sections 12.04 or 12.06. The claimant's impairments and symptoms do not meet or equal any psychiatric listing section of Appendix 1, and the claimant has the mental functional ability to perform unskilled work (R. 17-18).

The record suggests that the claimant is blind in the left eye, but he has normal vision of the right eye. Therefore, he does not meet or equal the requirements of any of the listing sections of Appendix 1 dealing with vision (R. 18).

The claimant's diabetes does not meet or equal the requirements of any listing section of Appendix 1. There is no evidence of significant problems from diabetes or any end organ damage (R. 18).

The claimant's vertebrogenic disorder does not meet or equal the requirements of any listing section of Appendix 1. An x-ray of the cervical spine was within normal limits, and there is no evidence of disc herniation or spinal stenosis involving the lumbar spine. Physical examinations have been within normal limits, and there is no evidence of any neurological deficits (R. 18).

The ALJ then defined Plaintiff's residual functional capacity, in which he took into account Plaintiff's ability to "lift up to 50 pounds and engage in a good deal of standing, walking, and sitting"; Plaintiff's "vision deficit, subjective discomfort, psychiatric symptoms, and limited academic achievement"; Plaintiff's inability to drive or travel; Plaintiff's need to "change positions briefly for one or two minutes at least every hour"; Plaintiff's ability to read or write above a third grade level; Plaintiff's inability to be exposed to "significant workplace hazards such as heights or dangerous moving machinery"; Plaintiff's need for an "unskilled" job "involving simple one to three step tasks"; Plaintiff's limitations with working "with the general public or close interactions with co-workers or supervisors"; Plaintiff's need to avoid "fast-paced or assembly line" jobs; Plaintiff's need for "modestly flexible work without hard deadlines or quotas"; Plaintiff's need for being absent two days per month; and Plaintiff's need for "initial supportive supervision" at a job (R. 20). Based on this RFC, in which the ALJ considered all

symptoms and their resulting impairments, the ALJ found "the claimant is unable to perform any past relevant work" (R. 20).

Finally, the ALJ, at step five, posed a hypothetical question to the ALJ concerning the availability of jobs that did not require "good depth perception or good peripheral vision"; did not require "driving or traveling as part of the job"; permitted position changes "briefly for one to two minutes at least every hour"; did not require reading or writing above a third grade level; did not involve "significant workplace hazards such as heights or dangerous moving machinery"; involved "simple one to three step job tasks"; did not involve "work with the general public or close interaction with co-workers or supervisors"; did not involve fast-paced assembly line work; did provide "modestly flexible work without hard deadlines or quotas"; did allow "for up to two days absence per month"; and did provide "initial supportive supervision" (R. 21).

As demonstrated in the above examples and as required in *Alderman, supra*, the ALJ did consider the combined and synergistic effects of a Plaintiff's impairments. His findings at steps two, three, four, and five are "specific and well-articulated findings as to the effect of the combination of impairments" as required in *Cook, supra*. Specifically, in step two, the ALJ noted Plaintiff's impairments were "severe," "at least in combination" with one another, but not so severe as to meet any Listing (R. 17). In step three, the ALJ, in a very explicit and detailed fashion, evaluated each impairment and concluded none of the impairments met a Listing. As to Plaintiff's depression and anxiety, the ALJ found Plaintiff had only mild limitation in his activities of daily living; moderate limitation in his social functioning; and mild limitations in concentration, persistence, or pace. The ALJ found Plaintiff did not have "any marked or extreme functional limitations" and that Plaintiff did have the "mental functional ability to perform unskilled work." These findings were supported by the substantial evidence of record found

23

in the evaluation of Ms. Allen-Henderson and Dr. Steward (R. 17-18, 242-69). In steps four and five, the ALJ combined all impairments in determining the Plaintiff's RFC and formulating the hypothetical question for the VE's consideration. In determining Plaintiff could not return to his past relevant work and in crafting a comprehensive hypothetical, the ALJ considered criteria relative to Plaintiff's depression and anxiety (jobs with initial supervisory support, flexible work, no reading or writing above third grade level, simple one to three step tasks, no hard deadlines, no involvement with general public, no close interaction with co-workers); vertebrogenic disorder (jobs with no traveling, no driving, opportunity to change positions, no significant workplace hazards, two days per month for absences); and left-eye blindness (jobs that do not require good depth perception or good peripheral vision) (R. 20).

As to Plaintiff's impairment of type 2 diabetes, the ALJ found, at step three, that Plaintiff's "diabetes does not meet or equal the requirements of any listing section of Appendix 1. There is no evidence of significant problems from diabetes or any end organ damage" (R. 18). Indeed, Plaintiff was diagnosed with d. mellitus, Type II, a diabetes which can be controlled through proper diet. At the administrative hearing, Plaintiff testified he had been prescribed Avandia and Amaryl, which caused a reduction in his blood sugar level. Plaintiff also stated he had never been instructed by his physician as to the proper diet for controlling his diabetes, but that he does not "eat as much sweets . . . or drink as many pops . . ." (R. 300-01). Additionally, there is no evidence in the record that this condition caused any limitation as to Plaintiff's ability to function (R. 207, 225, 230, 232, 242).

The undersigned, therefore, finds the ALJ did not err in his consideration of the combined and/or synergistic effects of Plaintiff's impairments on his ability to work and that substantial evidence of record supports the ALJ's findings.

## D. Credibility Analysis

Plaintiff contends "there is a lack of substantial support for Step One of the ALJ's credibility analysis pursuant to SSR 96-7p in that he found [Plaintiff] suffered from conditions which were not reasonably likely to produce the symptoms to the degree alleged." Defendant contends the ALJ properly determined that Plaintiff was not entirely credible.

SSR 96-7p reads, in part, as follows:

> PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:

> > 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

> > 2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

> > . . .

> > 4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the

individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

In *Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996), the Fourth Circuit developed the following two-step process for determining whether a person is disabled by pain or other symptoms:

1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific

descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra* at 594.

At step one in the two-step process as outlined in SSR 96-7p and mandated in *Craig, Id.*, the ALJ must make a finding as to whether Plaintiff had a medically determinable condition that could reasonably be expected to produce the symptoms of which he complained. The ALJ found as follows: "[t]he medical evidence establishes the existence of some impairments reasonably expected to produce some of the symptoms and limitations alleged by the claimant" (R. 19). According to the ALJ, those impairments were "vertebrogenic disorder, diabetes mellitus, left eye blindness, depression, and anxiety" (R. 17). Plaintiff, in his brief, alleges "[t]he decision is DEVOID of the all-important first step in the credibility process, which forces the adjudicator to make a specific finding as to whether the Plaintiff has or has not present [sic] proof of medical impairments which would cause the very symptoms complained of." (Plaintiff's brief at p. 10.) This allegation is incorrect. The finding at step one was clearly not omitted; the ALJ did make the appropriate finding at the first prong of the credibility analysis. Because the ALJ found Plaintiff's impairments could reasonably produce the symptoms and limitations of which the Plaintiff complained, he progressed to step two in the analytic process prescribed by SSR 96-7p and *Craig, Id.*

The ALJ examined the intensity, persistence, and functional limitions of Plaintiff's symptoms of pain relative to his ability to do basic work activities. The ALJ appropriately considered objective medical evidence, statements and other information provided by treating or examining physicians and psychologists, and Plaintiff's own statements as to his symptoms to make a determination of Plaintiff's credibility.

The objective medical evidence which was reviewed by the ALJ included results of an x-ray and

two MRI's. The ALJ considered the August 24, 2001, x-ray of Plaintiff's cervical spine, which showed "no fracture or subluxation, no significant degenerative disc disease, and only mild cervical spondylosis" (R. 17, 274). The ALJ opined that this x-ray "was within normal limits," and showed "no evidence of disc herniation or spinal stenosis involving the lumbar spine" (R. 18). Additionally, the ALJ evaluated the November 6, 2001, MRI of Plaintiff's cervical spine and the November 13, 2001, MRI of Plaintiff's lumbar spine. He noted the results were for a "normal" cervical spine and a "disc bulging at L4, L5, and the L5-S1 interspace" of Plaintiff's lumbar spine (R. 17, 181, 182). The ALJ opined that the "[d]iagnostic testing involving the cervical spine and lumbar spine did not show any severe spinal impairments" (R. 19). The evidence of record also contained the results of testing for diabetes which was considered by the ALJ. Plaintiff was diagnosed with type 2 diabetes and his blood sugar was gauged (R. 207, 230, 232). No dietary restrictions were implemented by Plaintiff's treating physician and prescribed medications reduced the blood sugar level (R. 300, 301). The ALJ opined the evidence of record produced "no evidence of significant problems from diabetes or any end organ damage" (R. 18). These medical tests revealed that Plaintiff did not suffer from any "severe spinal disorder" and that diabetes did not limit his functionality (R. 19). The results of Plaintiff's x-ray, MRI's, and laboratory tests, therefore, are substantial, objective medical evidence which supports the ALJ's finding as to Plaintiff's symptoms and how they affected the him.

In addition to the objective medical evidence of record, the ALJ reviewed, evaluated, and considered the statements and other information provided by examining physicians, the treating physician, and consultative psychologists about Plaintiff's symptoms. He noted the opinions of Dr. Sabio, an examining physician, who interpreted Plaintiff's x-ray as "normal," MRI of Plaintiff's cervical spine as "normal," and MRI of Plaintiff's lumbar spine as positive for bulging disc and L5-S1 interspace.

28

The ALJ addressed Dr. Sabio's opinion that Plaintiff walked with a normal gait, demonstrated "normal muscle strength in all four extremities," and displayed a normal neurological examination. The ALJ also noted Dr. Sabio's diagnosis of "degenerative disc disease and amblyopia of the left eye" (R.17). Dr. Sabio did not assess debilitating pain caused by any impairment nor did he make a finding during his examination of Plaintiff that confirmed his functionality was impaired because of his condition or the pain resulting therefrom (R. 126-27).

The ALJ also addressed the treatment records from Braxton Community Health Center, noting that Plaintiff's "most recent examination on August 6, 2002, was within normal limits" (R. 17). Specifically, that examination revealed Plaintiff's gait and station, fine motor ability, gross motor ability joints of all extremities, muscle bulk, reflexes, sensory deficits, motor strength, coordination, frequence of seizures, respiratory, cardiovascular, digestive functions and mental status were normal. He opined that Plaintiff's range of motion in his back and neck were abnormal (R. 184). The examiner did not assess a condition that would create the type of pain which Plaintiff alleged. This is substantial evidence that supports the ALJ's finding that "treatment records do not substantiate the claimant's allegations of severe symptoms or functional problems" (R. 19).

In addition to the observations and opinions of Dr. Sabio and the physician from the Braxton Community Health Center, the ALJ also evaluated the opinion of the ophthalmologist regarding Plaintiff's vision in that he noted Plaintiff's normal vision in his right eye (R. 17). Further, a review of the evidence of record reveals that the monocular blindness experienced by the Plaintiff in his left eye was caused by a cataract, which Plaintiff intended to have surgically corrected (R. 306-07). The ophthalmologist did not opine that Plaintiff's post-surgery vision capabilities would cause the continued degree of limitation as alleged by the Plaintiff and this constitutes substantial evidence to support the

ALJ's finding that "claimant's allegations of severe symptoms or functional problems" are not supported (R. 19, 239).

The ALJ also evaluated and considered the opinions of consulting psychologists, Ms. Allen-Henderson and Dr. Steward. He noted the following:

> A mental status examination was within normal limits. WAIS-III testing was conducted and the claimant had IQ scores ranging from 74 to 97. After further evaluation, the diagnoses were a moderate, recurrent, major depressive disorder, polysubstance dependence in remission, and a reading disorder. The claimant's global assessment of functional was estimated to be 56. Dr. Steward also completed a mental unctional assessment rating the claimant's functional limitations as generally "slight" to 'moderate" though the PRTF also noted three extended decompensations (R. 17).

Based on the psychologists' assessment of Plaintiff, the ALJ found Plaintiff's mental condition could not reasonably be expected to cause the symptoms alleged because there had "been no documented episodes of decompensation of extended duration," Plaintiff had "not required any psychiatric hospitalizations," and he had not required "even episodic treatment from a mental health professional." The ALJ found, after fully considering the conclusions of Dr. Steward and Ms. Allen-Henderson, that Plaintiff demonstrated "mild limitations" to his activities of daily living, "moderate limitations" to his degree of social functioning, and "mild limitations" as to his concentration, persistence, or pace. This is substantial evidence to support the finding by the ALJ that Plaintiff did not "have any marked or extreme functional limitations" (R. 18).

As to the December 12, 2002, opinion of Plaintiff's treating physician, Dr. Boyce, relative to Plaintiff's complaints of pain, the ALJ considered his finding that Plaintiff "was unable to perform work due to low back pain and left eye blindness." He noted this opinion was not supported by "any medical findings" and found the "opinions of Dr. Boyce" to not be "persuasive" (R. 17, 19). The evidence of record relative to Dr. Boyce's finding as to Plaintiff's limitations as considered by the ALJ, showed, at

best, disc bulges and interspacing of Plaintiff's spine; elevated blood sugar, which created no "significant problems" or "any end organ damage"; and monocular blindness caused by cataract, which was scheduled for removal (R. 17, 18, 19). This is substantial evidence to support the ALJ's evaluation and opinion as to the diagnosis of Dr. Boyce.

Finally, the ALJ evaluated Plaintiff's own statements about his pain. He noted the following:

> At the hearing, [Plaintiff] alleged low back pain, headaches, hand swelling, and neck pain. The claimant takes hydrocodone for pain. He indicated that medications make his pain bearable. He alleged that he does not have money for medical treatment. The claimant also has diabetes. [Plaintiff] alleged constant pain worsened by prolonged sitting and standing. The claimant is able to walk less than one mile, sit for an hour at a time, stand for 30 minutes, and lift a gallon of milk. He alleged that he will sometimes drop items. The claimant is blind in the left eye. Regarding daily activities, [Plaintiff] testified that he spends most of the day in a recliner. He sometimes visits his brother and a friend. He is able to care for his own personal needs. The claimant was able to go hunting once and go fishing twice in 2002. The claimant attends church two or three times per week. He watches television and will occasionally go to a restaurant. The claimant indicated that he re-injured his back last month after picking up a piece of wood to put in his brother's wood stove. [Plaintiff] alleged depression but he does not receive any psychiatric treatment. The claimant alleged frequent headaches, reduced energy, sleep disturbance, right arm numbness, and leg cramps (R. 19).

> The claimant alleged he was unable to lift over 10 pounds, however, he indicated that he threw his back out shoveling cow manure in a field and again lifting a large block of wood. Despite his impairments and symptoms, the claimant is able to care for his own personal needs, drive a car, and attend church. He was able to go hunting and fishing in 2002, during the time he alleged disability. The claimant has not required significant treatment for his back. He has only required conservative treatment, and there is no evidence of a severe spinal disorder. Physical examinations and neurological examinations have been within normal limits. A detailed consultative examination was within normal limits (Exhibit 3F). Additionally, the claimant has a mental functional ability to perform at least unskilled job tasks. He does not require psychiatric treatment and has never required psychiatric hospitalization . . . (R. 19).

The ALJ, in his evaluation and consideration of Plaintiff's statements, revealed inconsistencies in Plaintiff's testimony regarding his functionality. Plaintiff stated he could not lift more than ten (10)

pounds, but he admitted to shoveling cow manure and lifting a fire log. In contrast to Plaintiff's statements about his limitations caused by his experiencing "constant pain," he could, as noted by the ALJ, care for his own personal needs, drive a vehicle, frequently attend church services, and infrequently hunt and fish. Additionally, the ALJ assessed Plaintiff's credibility based, in part, on his not requiring significant treatment for his back condition, but only requiring conservative treatment in the form of chiropractic care (R. 18). These inconsistencies, coupled with the objective medical evidence and the opinions provided by treating or examining physicians or psychologists, constitute substantial evidence that supports the ALJ's determination as to Plaintiff's credibility.

The ALJ's credibility analysis was properly performed and his determination is given great weight. The ALJ adhered to step-one in the two-part analysis of credibility as imposed in *Craig, supra*. He then effectively and correctly evaluated the objective medical evidence of record as to Plaintiff's impairments; the opinions of the treating physician, examining physicians, and psychologist as to Plaintiff's conditions, pain, and functionality; and Plaintiff's testimony in determining his credibility as required in step two. The undersigned, therefore, finds the ALJ did not err in his assessment of Plaintiff's complaints of pain in accord with SSR 96-7p and that substantial evidence exists to support the ALJ's determination regarding Plaintiff's credibility as to his subjective complaints.

### E. Treating/Examining Physicians' Opinions

Plaintiff contends "the ALJ improperly substituted his own opinion for that of qualified medical and mental health professionals, totally discounted the treating physician's opinion who had examined the Plaintiff and treated him for a number of years, was familiar with the Plaintiff and was witness to his decline in functional ability and emotional well being, completely ignored the opinion evidence by the examining psychologist. The ALJ should have properly followed the mandates set forth in SSR 96-

32

2p, 96-6p and specifically 96-5p which states within the Requirements for Recontacting Treating Sources, 'Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.' 20 C.F.R. 416.912, 404,1512; Lewis v. Weinberger, 541 F.2d 417, 421 (4th Cir. 1976)." Defendant contends the ALJ properly considered the opinions of the examining medical sources.

Plaintiff asserts that the ALJ, in weighing the opinions of Dr. Boyce, should have applied SSR 96-2p, which reads as follows:

> A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.
>
> 1. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.
>
> 2. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well- supported by medically acceptable clinical and laboratory diagnostic techniques.
>
> 3. Even if a treating source's medical opinion is well- supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.
>
> 4. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.
>
> 5. If a treating source's medical opinion is well- supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.
>
> 6. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

The undersigned finds Plaintiff's contention that the ALJ improperly substituted his own opinion

for that of qualified medical professional and totally discounted the treating physician's opinion to be without merit (Plaintiff's brief at p. 12). A careful review of the ALJ's decision reflects the following as to the evidence of Dr. Boyce and the consideration of that evidence by the ALJ, which conforms with the mandates is SSR 96-2p:

1.  The ALJ acknowledged Dr. Boyce as Plaintiff's treating physician and noted his opinion was "entitled to appropriate consideration pursuant to SSR 96-2p. This acknowledgment satisfied the requirements of SSR 96-2p(1).

2.  The ALJ did "not find the opinions of Dr. Boyce to be persuasive" as to Plaintiff's limitations (R. 19). In support of this finding, the ALJ noted:

    a)  "Diagnostic testing involving Plaintiff's cervical spine and lumbar spine did not show any severe spinal impairment" (R. 19). The ALJ relied on an x-ray of Plaintiff's cervical spine, which was normal; a MRI of Plaintiff's cervical spine, which was normal; and a MRI of Plaintiff's lumbar spine, which showed "disc bulging" and L5-S1 "interspace" (R. 17, 18). This finding, and the supporting criterion, satisfied the requirement of SSR 96-2p (2).

    b)  "There is no evidence of neurological deficits" (R. 19). The ALJ relied on the finding of Dr. Sabio, who opined on May 25, 2002, that Plaintiff's "neurological examination was normal" (R. 17.) This finding, and the supporting criteria, satisfied the requirement of SSR 96-2p(3).

    c)  "There are no medical findings supporting [Dr. Boyce's] change of opinion and Dr. Boyce has not provided objective findings to justify his opinions regarding the claimant's functional limitations" (R. 19). The functional limitations to which the ALJ referred was the December 12, 2002, finding by Dr. Boyce that Plaintiff "was unable to perform any work due to back pain and left eye blindness" (R. 19). The ALJ relied on the opinions of the two state-agency physicians who found Plaintiff could occasionally lift and/or carry fifty (50) pounds and frequently lift and/or carry twenty-five (25) pounds (R. 20, 130, 198). The ALJ also relied on the opinion of the ophthalmologist that Plaintiff's vision was normal in his right eye and that the monocular blindness of the left eye was caused by a cataract, which was to be surgically removed (R. 18, 239-40, 306-07). These findings, and the supporting criterion, satisfied the requirement of SSR 96-2p(3).

34

Since the treating physician's medical opinion was not well-supported and inconsistent with other substantial evidence in the record, the ALJ properly did not assign controlling weight to it, but he did treat it with deference, all in conformance with SSR 96-2p(5) and (6).

As the above recounted examples demonstrate, the ALJ did not improperly substitute his own opinion for that of Dr. Boyce, but he relied on the clinical findings of record and the medical opinions of Dr. Sabio, the state-agency physicians, and Dr. Lackey in accurately considering and evaluating the opinion of Plaintiff's treating physician in accord with SSR 96-2p.

Relative to the ALJ properly following the mandates of SSR 96-6p, the Plaintiff alleges the following in his brief:

> In his decision, the ALJ reported having considered opinions of state agency medical and psychological consultants and in accordance with SSR 96-6p, to be treated as expert opinion evidence from nonexamining sources. The ALJ states "These medical experts have indicated that the claimant has the necessary mental and physical residual functional capacity to perform work." (Tr. 20). This appears to be in part, the basis for the ALJ's finding the opinion of the examining psychologist and treating physician were not persuasive (Tr. 19). (Plaintiff's brief at pp. 14-15).

As noted above, the ALJ did consider the opinions of the state-agency physicians in formulating his decision that Dr. Boyce's opinion was not persuasive. The ALJ's treatment of the evaluations of both state-agency physicians followed the mandate of 96-6pm, which established the following requirements:

1. Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review.

2. Administrative law judges and the Appeals council may not ignore these opinions and must explain the weight given to these opinions in their decisions.

3.     An updated medical expert opinion must be obtained by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence can be made.

The ALJ found the following regarding the opinions of the state agency physicians:

Social Security Ruling 96-6p requires that the opinions of state agency medical . . . consultants be treated as expert opinion evidence from nonexamining sources. The undersigned is not bound by the conclusions of these nonexamining sources, but has considered their opinions and given them appropriate weight in rendering this decision. These medical experts have indicted that the claimant has the necessary . . . physical residual functional capacity to perform work. This seems correct, and these opinions are relied upon in part (R. 20).

In conformance with SSR 96-6p, the ALJ treated the opinions appropriately, he did not ignore them, and he assigned appropriate weight to them. The ALJ correctly examined and considered these opinions and properly applied them in formulating his decision as to Dr. Boyce's opinions and in defining Plaintiff's residual functional capacity.

The Plaintiff also asserts the ALJ improperly substituted his own opinion for that of qualified a mental health professional and completely ignored the opinion evidence by the examining psychologist. The undersigned finds this assertion is without merit. The ALJ systematically and thoroughly considered and evaluated the opinions of Dr. Steward and Ms. Allen-Henderson in rendering his decision regarding Plaintiff's depression and anxiety. The ALJ considered the findings regarding Plaintiff's activities of daily living, for which he found mild functional limitations; he considered Plaintiff's social functioning, for which he found moderate functional limitations. The ALJ evaluated the findings relative to Plaintiff's concentration, persistence, pace, and verbal IQ, and he found Plaintiff was able to perform "at least" unskilled job tasks. The ALJ then evaluated the information contained in the evaluations regarding Plaintiff's episodes of decompensation, noting, regardless of the opinion of Dr. Steward and Ms. Allen-Henderson, none was ever documented. The ALJ opined as

follows: "In summary, the claimant does not have any marked or extreme functional limitations. His impairments also do not meet "C" criteria requirements of Sections 12.04 or 12.06. The claimant's impairments and symptoms do not meet or equal any psychiatric listing section of Appendix 1..." (R. 18). This thorough appraisal of the results of the evaluations conducted by Dr. Steward and Ms. Allen-Henderson demonstrates the ALJ did not substitute his opinion for that of mental health professionals; it also demonstrates that the ALJ did not ignore the opinion of the consultative psychologist. He reviewed the findings, he assessed the evaluations, and he based his decision on the information contained therein (R. 17-18).

The Plaintiff further asserts in his brief that the ALJ "intimates the Plaintiff has no mental health impairments, rationalizing that the Plaintiff did not obtain psychiatric treatment nor was the Plaintiff in need of this service. This is not supported by the record" (Plaintiff's brief at p. 14). This assertion is erroneous. The ALJ, after assessing the opinions of Dr. Steward and Ms. Allen-Henderson, after reviewing the evidence of record, and after conducting an administrative hearing, noted Plaintiff "had not required any psychiatric hospitalizations, and he does not require even episodic treatment from a mental health professional" (R. 18). The ALJ intimated nothing; he rationalized nothing. The record clearly supports his finding as to Plaintiff's mental impairments.

Plaintiff also contends the ALJ "completely ignored the handwritten narrative statements (251-254) upon the MRFC assessment form, which are critical items of opinion evidence in the file. Nowhere in the decision does the judge mention these specific, critical statements. This omission alone is sufficient grounds for reversal of the decision pursuant to SSR 96-2p" (Plaintiff's brief at p. 14). Although the ALJ does not specifically restate the handwritten notations of the examiner, he did, in his discussion of the mental residual functional capacity assessment of work-related abilities, consider and

evaluate as follows the limitations that were found therein: 1) limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines were addressed with his findings that Plaintiff had mild limitation involving concentration, persistence, or pace, above average attention, and would be able to perform at least unskilled job tasks; 2) limitations in social functioning in a normal competitive work environment were addressed with his findings that Plaintiff demonstrated moderate limitation in social functioning in that he is able to perform activities outside his home requiring interactions with others; 3) limitations in adapting in a work setting were noted as "slight"; 4) limitations in functioning independently in a competitive work setting were noted as being "slight"; and 5) limitations in work adjustment were noted as "moderate" (R. 17, 18, 252-54). The record confirms the ALJ did not "completely ignore" the opinions of Dr. Steward and Ms. Allen-Henderson relative to Plaintiff's RFC (Plaintiff's brief at p. 14). In light of the ALJ's comprehensive evaluation of the findings contained in the mental residual functional capacity assessment, his failure to "mention these specific, critical statements" is not reversible error (Plaintiff's brief at p. 14).

Additionally, the argument that the omission of a discussion of these notations by the ALJ as found in his mental residual functional capacity assessment is grounds for reversal pursuant to SSR 96-2p is without merit. This Regulation applies to treating physicians. Dr. Steward and Ms. Allen-Henderson were not treating Plaintiff for his mental health; they conducted an evaluative examination of Plaintiff at the request of Plaintiff's counsel (R. 242).

The Plaintiff also alleges that the "ALJ should have properly followed the mandates set forth in . . . SSR 96-5p" (Plaintiff's brief at p. 13), specifically the following portions of the Regulation:

> Nevertheless, our rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they

provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.

. . .

Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis.

. . .

Adjudicators must weigh medical source statements under the rules set out in 20 CFR 404.1527 and 416.927, providing appropriate explanations for accepting or rejecting such opinions.

Plaintiff contends that the "ALJ found the opinions of Plaintiff's treating physician, Dr. Boyce, not persuasive because there were no medical findings supporting his change of opinion and did not provide objective findings to justify his opinions. (Tr. 19). No clarification was requested and the ALJ should have properly requested further information for Plaintiff's treating Physician" (Plaintiff's brief at p. 14). As noted previously, Dr. Boyce changed his July 29, 2002 opinion as to Plaintiff's limitations, stating on December 12, 2002, that Plaintiff was unable to perform any work due to back pain and left eye blindness; the ALJ opined "[t]here are no medical findings supporting this change of opinion, and Dr. Boyce has not provided objective findings to justify his opinions regarding the claimant's functional limitations" (R. 19, 225, 228). The undersigned finds the ALJ did not err in not recontacting Dr. Boyce for clarification because the ALJ was able to determine the basis for not being persuaded by Dr. Boyce's opinion. That basis was the existing x-ray and MRI's and the opinions of Dr. Sabio, Dr. Lackey, and the state agency physicians as to Plaintiff's limitations, which were considered by the ALJ in compliance with SSR 96-5p, which provides the following: "The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must

evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." The evidence in the case record which was considered by the ALJ was the 1) "[d]iagnostic testing ( in the form of an x-ray, which was normal; a MRI, which was normal; and another MRI, which showed "disc bulging" and "interspace" at L5-S1) involving Plaintiff's cervical spine and lumbar spine did not show any severe spinal impairment" (R. 17, 18, 19); 2) "no evidence of neurological deficits," as noted by Dr. Sabio, who opined on May 25, 2002, that Plaintiff's "neurological examination was normal" (R. 17, 19); 3) the opinions of the two state-agency physicians, who found Plaintiff could occasionally lift and/or carry fifty (50) pounds and frequently lift and/or carry twenty-five (25) pounds (R. 20, 130, 198); 4) and the opinion of the ophthalmologist that Plaintiff's vision was normal in his right eye and that the monocular blindness of the left eye was caused by a cataract, which was to be surgically removed (R. 18, 239-40, 306-07). Further medical test results and medical opinions were not necessary for clarification of Dr. Boyce's opinion. The available evidence of record created a sound basis on which that opinion could be evaluated, and the ALJ was correct in relying on this evidence of record as his basis for evaluating the opinion of Plaintiff's treating physician.

The Plaintiff also contends the ALJ did not properly apply SSR 96-5p ". . . with respect to the psychological evaluation and assessments contained at Tr.242-266." Plaintiff argues "the ALJ should have properly obtained clarification from the examining source if he had any reservation to the findings within this report and assessments or obtained a second opinion in lieu of substituting his own opinion for that of mental health professionals" (Plaintiff's brief at p. 14). The undersigned finds the ALJ effectively evaluated the mental assessments of Plaintiff which were completed by Dr. Steward and Ms. Allen-Henderson. First, the ALJ reviewed the reports and findings of Dr. Steward and Ms. Allen-Henderson. He measured their assessment of Plaintiff's activities of daily living functionality and those

activities to which the Plaintiff testified he could complete and made a finding that Plaintiff was mildly limited in this area. Likewise, the ALJ measured Dr. Steward and Ms. Allen-Henderson's assessment of Plaintiff's social functioning to those abilities in which the Plaintiff stated he could participate and made a finding that Plaintiff may be moderately limited in his social functioning. The ALJ also reviewed and considered the test results as to Plaintiff's pace, concentration, persistence, verbal IQ, and attention and made a finding as to Plaintiff's limitations in those regards. After reviewing and weighing the findings of Dr. Steward and Ms. Allen-Henderson, the ALJ opined that the Plaintiff would be able "to perform at least unskilled jobs" and that the Plaintiff did "not have any marked or extreme functional limitations." He found Plaintiff did not meet any psychiatric listing (R. 17-18). Second he considered the findings in light of the entire evidence of record. The Plaintiff had not sought any mental health treatment or hospitalizations. His only encounter with a mental health professional was the evaluations completed on him by Dr. Steward and Ms. Allen-Henderson. The ALJ made a finding as to their opinions which was based on his assessment of their reports and a review of the evidence of record. The ALJ did not state he had "any reservation" as to the findings of Dr. Steward and Ms. Allen-Henderson. He simply reviewed, evaluated, and weighed them to formulate his decision. This evidence is substantial and it was proper for the ALJ to rely on it as a basis for his decision as to Plaintiff's mental functionality.

For the above stated reasons, the undersigned finds the ALJ did not err in the weight he afforded the opinion of Plaintiff's treating physician; the ALJ did not err in his evaluation of the findings of examining mental health professionals; the ALJ did not err in his application of the mandates found in 96-2p relative to his evaluation of the opinion of the treating physician; the ALJ did not err in his application of the mandates found in 96-6p relative to his evaluation and consideration of the opinions of the state agency physicians; and the ALJ did not err in his application of the mandates found in 96-5p

relative to his determining the basis on which he considered, evaluated, and weighed the opinions of Plaintiff's treating physician and examining mental health professionals.

## F. Substantial Evidence to Support RFC

Plaintiff contends "there is a lack of substantial evidentiary support for the RFC found by the ALJ in his decision, in that the ALJ impermissibly omitted without explanation the specific mental limitations identified by the examining psychologist." The Defendant, however, contends the ALJ's RFC assessment accommodated all of Plaintiff's limitations that were supported by the record.

As defined in 20 C.F.R. §§ 404.1545 and 416.941, residual functional capacity is what the Plaintiff can still do despite his limitations. Plaintiff's RFC is an assessment based upon all of the relevant evidence. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Plaintiff's medical condition. Observations by treating physicians and psychologists . . . of Plaintiff's limitations may be used in formulating the RFC and these observations must be considered along with the medical records to assist the Commissioner in deciding to what extent the impairments prevent Plaintiff from performing particular work activities.

Plaintiff's RFC was found by the ALJ to be as follows:

> Based on the entire record, the undersigned finds the claimant retains the residual functional capacity to lift up to 50 pounds and engage in a good deal of standing, walking, and sitting. These functional abilities are consistent with a full range of medium work. The claimant's vision deficit, subjective discomfort, psychiatric symptoms, and limited academic achievement may limit him to jobs not requiring good depth perception or good peripheral vision; work not requiring driving or traveling as part of the job; jobs allowing him to change positions briefly for one to two minutes at least every hour; jobs not requiring reading or writing above a third grade level; jobs not involving significant workplace hazards such as heights or dangerous moving machinery; unskilled jobs involving simple one to three step job tasks; jobs not involving work with the general public or close interaction with co-workers or supervisors; jobs not involving fast-paced or assembly line work; modestly flexible work without hard deadlines or quotas; jobs allowing for up to two days absent per month; and jobs with initial supportive supervision (R. 20).

The ALJ, in determining the RFC, did look at the relevant medical evidence, particularly the evidence

of Dr. Steward and Ms. Allen-Henderson, Dr. Sabio, the state-agency physicians, and Dr. Boyce, Plaintiff's .

The ALJ thoroughly reviewed the findings of Ms. Allen-Henderson and Dr. Steward as to Plaintiff's functionality relative to his activities of daily living and social interaction; concentration, persistence, or pace limitations; verbal IQ; and attention capabilities. He evaluated their opinion and the evidence of record as to Plaintiff's episodes of decompensation. Additionally, the ALJ assessed and considered information provided by Dr. Steward that Plaintiff had not required psychiatric hospitalization or treatment for his mental health condition. This comprehensive evaluation led the ALJ to find that Plaintiff "does not have any marked or extreme functional limitations" caused by his mental limitations and that Plaintiff had "the mental functional ability to perform unskilled work" (R. 17-18). The aforementioned evidence constitutes substantial evidence and supports the finding by the ALJ relative to Plaintiff's RFC..

According to Plaintiff, the ALJ's RFC failed to include "ordinary job stress, which limited his ability to tolerate a normal workday, maintaining [sic] regular attendance and punctuality; and completing [sic] a normal workday and workweek, up to ½ the time or ½ the workday" (Plaintiff's brief at p. 16). The ALJ, in his RFC, did accommodate Plaintiff's need to avoid "ordinary job stress" in that he found the following limitations:

> The claimant's . . . psychiatric symptoms . . . may limit him to . . . jobs not requiring reading or writing above a third grade level; . . . unskilled jobs involving simple one to three step job tasks; jobs not involving work with the general public or close interaction with co-workers or supervisors; jobs not involving fast-paced or assembly line work; modestly flexible work without hard deadlines or quotas; jobs allowing for up to two days absent per month; and jobs with initial supportive supervision (R. 20).

These limitations accommodate Plaintiff's need to avoid "ordinary job stress." The ALJ considered the

43

opinions of the psychologists that Plaintiff was unable to tolerate a normal workday, maintain regular attendance and punctuality, or complete a normal workday or workweek by specifically including, in addition to unskilled, simple jobs, jobs that were not fast paced, were flexible in that they did not have hard deadlines or quotas, and from which Plaintiff could be absent for up to two days per month (R. 20). The psychologists' finding that Plaintiff's required one-half workdays or work weeks were not specifically included in the ALJ's RFC because he found Plaintiff did "not have any marked or extreme functional limitations," and such absences from employment would be considered extreme (R. 20). The ALJ's inclusion of "modestly flexible work" was sufficient to accommodate Plaintiff's inability to complete a normal work day or week.

In his brief, Plaintiff also asserts that ". . . without explanation the ALJ's RFC did not contain the treating physician's exertional limitation of no lifting more than 10 pounds" (Plaintiff's brief at p. 16). The ALJ, contrary to Plaintiff's assertion, found "no medical findings" in the evidence provided by Dr. Boyce to support his opinions as to Plaintiff's limitations. Additionally, the ALJ found "Dr. Boyce has not provided objective findings to justify his opinions regarding the claimant's functional limitations" (R. 19).

20 C.F.R. § 404.1527 states, in part:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> . . .
>
> > (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique

> perspective to the medical evidence that cannot be
> obtained from the objective medical findings alone or
> from reports of individual examinations, such as
> consultative examinations or brief hospitalizations. If we
> find that a treating source's opinion on the issue(s) of the
> nature and severity of your impairment(s) is well
> supported by medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent with the
> other substantial evidence in [the] case record, we will
> give it controlling weight.

In accordance with this Regulation, the ALJ found Dr. Boyce's opinion was not supported by medically

acceptable clinical and laboratory diagnostic techniques and was inconsistent with the other substantial

evidence in the record. The ALJ opined that "[d]iagnostic testing involving the cervical spine and

lumbar spine did not show any severe spinal impairments. There is also no evidence of any neurological

deficits" (R. 19-20). In concluding this, the ALJ considered the August 24, 2001, x-ray of his cervical

spine, which he found to be "within normal limits"; the November 6, 2001, MRI of Plaintiff's cervical

spine, which he found to be "normal"; and the November 13, 2001, MRI of Plaintiff's lumbar spine,

which he found revealed disc bulging and interspacing (R. 17, 18, 181, 182). These medically

acceptable clinical and laboratory diagnostic techniques do not support Dr. Boyce's finding that Plaintiff

could lift no more than ten (10) pounds.

Additionally, the record of evidence revealed, and the ALJ considered, the following: 1) the

findings of Dr. Sabio that Plaintiff possessed "normal muscle strength in all four extremities" and that

the "neurological examination was normal" (R. 17, 127-27); the opinion of a physician from the Braxton

Community Health Center that Plaintiff's fine motor ability, gross motor ability, joints of all extremities,

muscle bulk, and motor strength were normal (R. 17, 184); and the opinions of a two state-agency

physicians that Plaintiff could occasionally lift and/or carry fifty (50) pounds and frequently lift and/or

carry twenty-five (25) pounds (R. 20, 130, 198). As to the opinion of the state-agency physicians, the ALJ further found that "[t]hese medical experts have indicted that the claimant has the necessary . . . physical residual functional capacity to perform work. This seems correct, and these opinions are relied upon in part" (R. 20).

The opinions of Dr. Sabio, the physician at Braxton Community Health Center, and the two state-agency physicians contradict the opinion of Dr. Boyce that Plaintiff can lift no more than ten (10) pounds. The ALJ correctly considered and weighed each in determining Plaintiff's RFC. These opinions constitute substantial weight to support the ALJ's finding as to Plaintiff's RFC.

For the above reasons, the undersigned concludes the ALJ did not err in his determination of Plaintiff's residual functional capacity; the ALJ appropriately considered the evidence of record as to Plaintiff's mental limitations in determining Plaintiff's RFC; the ALJ properly considered, in accord with 20 C.F.R. § 404.1527(d)(2), the opinion of Plaintiff's treating physician as to his lifting RFC; and substantial evidence existed in the record and was correctly considered and weighed by the ALJ in formulating Plaintiff's RFC.

### G. Hypothetical Question to VE

Plaintiff contends "[t]he ALJ relied upon an incomplete and inadequate hypothetical question to the VE and ignored favorable testimony of the VE ruling out all work on the basis of mental limitations identified by the examining psychologist and physical limitations identified by the treating physician in violation of the Commissioner's regulations and the law of the circuit." Defendant contends the ALJ's hypothetical question to the vocational expert accommodated all of Plaintiff's limitations that were supported by the record.

The purpose of examining a vocational expert is to assist the ALJ in determining whether there

is work available in the national economy which Plaintiff can perform. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, *Chester v. Mathews,* 403 F.Supp. 110 (D.Md.1975), and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments, *Stephens v. Secretary of Health, Education and Welfare,* 603 F.2d 36 (8th Cir.1979).

Once the ALJ determined Plaintiff could not return to his past relevant work, he posed questions to the VE at the administrative hearing regarding work which was available within the regional and national economy that could be performed by Plaintiff based on his RFC, which was determined by the ALJ to be as follows:

> . . . he is able to lift up to 50 pounds of weight and engage in a good deal of standing, walking, and sitting; perform jobs not requiring good depth perception or good peripheral vision; work not requiring driving or traveling as part of the job; jobs allowing him to change positions briefly for one to two minutes at least every hour; jobs not requiring reading or writing above a third grade level; jobs not involving significant workplace hazards such as heights or dangerous moving machinery; unskilled jobs involving simple one to three step job tasks; jobs not involving work with the general public or close interaction with co-workers or supervisors; jobs not involving fast-paced or assembly line work; modestly flexible work without hard deadlines or quotas; jobs allowing for up to two days absent per month; and jobs with initial supportive supervision (R. 20, 22-23).

Based on this defined RFC, the ALJ posed the following hypothetical questions to the VE:

> If we assume a person of the same age, education and work experience as the claimant, but assume a person who is capable of doing medium work as that's defined in the Commissioner's regulations, but there would be a number of additional limitations. There would be no, no requirement for good depth perception. No good peripheral vision. No driving or travel as part of the job. The person should be able to change positions for a minute or two at least every hour. The person should not have to, there should be no requirement for reading more than fourth grade level or writing more than third grade level. And no work around significant workplace hazards like heights or dangerous moving machinery. And the job should involve a simple one to three-step tasks with no work with the general public, no close interaction with supervisors or coworkers, and no fast pace or assembly line work.

And what kind, let me just ask you a question. In your opinion, what kinds of things are parts of unskilled work that cause additional stress to most people? . . . As a Vocational Expert, if you are looking to place somebody in a low stress job, what would you say would be the kinds of things you'd want to avoid? . . . [L]et me add to what I've already said. There should be no, no hard deadlines or quotas in the job. The job should be more flexible, although the person could still meet work capabilities in terms of doing a job. But there shouldn't be like a hard deadline like so much done every hour, that kind of thing. A person should be able to miss up to two days of work per month and that there should be initial supportive supervision, but then they'd be able to do the job. Would there be any jobs such a person could do at the medium or light levels? (R. 330-31).

The hypothetical questions directed to the VE included all Plaintiff's limitations relative to his vertebrogenic disorder, left eye blindness, depression, and anxiety. The ALJ had determined Plaintiff's type 2 diabetes presented no "significant problems . . . or any end organ damage" (R. 18). The ALJ took into account Plaintiff's 1) vertebrogenic disorder when he included position changes, no driving, no travel, hazard limitations, and flexibility; 2) left eye blindness when he included no visual depth perception, no peripheral vision, no driving, and avoidance of heights or dangerous moving machinery; and 3) depression and anxiety when he included no reading above a fourth grade level, no writing above a third grade level, simple one to three-step tasks, no work with the general public, no close interaction with supervisors or coworkers, no fast pace or assembly line work, no hard deadlines, no quotas, flexibility, absences of up to two days per month, and initial supportive supervision. The hypothetical questions asked of the VE by the ALJ were not "incomplete and inadequate" as alleged by the Plaintiff (Plaintiff's brief at p. 17).

Additionally, the undersigned thoroughly reviewed the record regarding the VE's testimony regarding Plaintiff's prospects of future employment when his working "½ the time or ½ the workday" and ability to lift no more than ten (10) pounds were taken into account (Plaintiff's brief at P. 17). The following hypothetical question was posed to the VE: ". . . this person would have to have the option

48

to take breaks as needed and that up to one-half the time that this would involve more breaks than normally provided. . . . What, if any, impact would that have on these jobs that you've identified?" The VE replied "I think it would preclude all employment" (R. 338).

Plaintiff contends the ALJ ignored this testimony, but the undersigned finds that since the ALJ thoroughly considered and evaluated the opinion of Dr. Steward and Ms. Allen-Henderson, the mental examiners on whose opinion this question was couched, and determined their findings revealed Plaintiff had no "marked or extreme functional limitations," the ALJ was correct in not considering the VE's responses. In his assessment of the psychological evaluation, the Mental Residual Functional Capacity Assessment of Work Related Abilities, and the Psychiatric Review Technique completed of Plaintiff by Dr. Steward and Ms. Allen-Henderson, the ALJ considered and discussed the following points:

> 1) The ALJ found Plaintiff had "only mild limitation" in his activities of daily living functioning. He determined that Plaintiff was "independent with activities of daily living, and he is able to perform activities outside his home" (R. 17-18). The ALJ considered Plaintiff's testimony at the administrative hearing, at which Plaintiff stated he visited with his brother and a friend, he was capable of managing his own personal needs, he hunted once in 2002, he fished twice in 2002, he attended church two or three times per week, he watched television, and he occasionally ate in a restaurant (R. 19).

> 2) The ALJ found Plaintiff "may have moderate limitation" in maintaining social functioning," even though Dr. Steward and Ms. Allen-Henderson's evaluation "did not note any severe problems involving social functioning." The ALJ noted Plaintiff was "able to perform activities outside his home requiring interactions with others" (R. 18). This finding was supported by Plaintiff's testimony at the administrative hearing, at which he stated he visited his brother and a friend, he attended church two or three times per week, and he occasionally ate in a restaurant (R. 19).

> 3) In further evaluating the mental assessments of Dr. Steward and Ms. Allen-Henderson as to Plaintiff, the ALJ noted they had determined Plaintiff demonstrated above average attention and slightly below average concentration and that his verbal IQ was 97. The ALJ found Plaintiff's concentration, persistence, or pace to be mildly limited and opined that "no indication that the claimant would be

unable to perform at least unskilled job tasks" was offered by the evaluations. "Mild" limitations, as assessed by the ALJ, would not limit Plaintiff "in completing a normal workday and workweek, up to ½ the time or ½ the workday" as asserted by Plaintiff (Plaintiff's brief at p. 17) (R. 251, 266).

    4) The ALJ considered, in evaluating the information contained in the mental assessments of Plaintiff, that "no documented episodes of decompensation of extended duration" were experienced by Plaintiff, "despite the contrary notation of Dr. Steward." The ALJ also observed that Plaintiff had "not required any psychiatric hospitalizations" and had not required "even episodic treatment from a mental health professional" (R. 18). The record supports the ALJ's findings in that it contains evidence that Plaintiff sought chiropractic treatment and medical care for his vertebrogenic disorder and consulted an ophthalmologist for his cataract; he, as noted by the ALJ, did "not require psychiatric treatment and has never required psychiatric hospitalization" for his mental function (R. 17-18, 19, 119, 138-182, 183-196, 206-208, 209-221, 229-233, 238-240).

Additionally, the VE was asked, "Could I ask you if I add to the hypothetical instead of this last assumption that the person is limited in lifting to ten pounds, what, if any, impact would that have on the jobs that you've identified?" The VE responded, ". . . I would say there is a good, well, it would probably preclude the light jobs. . . . The ones I identified, the light ones. . . . It definitely would preclude them [medium jobs], too, yes" (R. 338). Again, Plaintiff contends the ALJ ignored this testimony, but the undersigned finds that since the ALJ found the opinion of Dr. Boyce, Plaintiff's treating physician who concluded he could lift no more than ten (10) pounds, to "not be persuasive" in his decision, he was correct in not considering the VE's response to this hypothetical (R. 19-20). The ALJ considered and discussed the opinion of Dr. Boyce as follows:

    1) The ALJ noted Dr. Boyce opined Plaintiff was capable of performing sedentary or light work on July 29, 2002, but on December 12, 2002, "he suggested that the claimant was unable to perform any work due to back pain and left eye blindness" (R. 19). The ALJ opined that "[t]here are no medical findings to justify his opinions regarding the claimant's functional limitations"; the x-ray and MRI's of Plaintiff's spine "did not show any severe spinal impairments," and the record contained "no evidence of any neurological deficits" (R. 19-20).

    2) Once the ALJ determined that Dr. Boyce's opinion as to Plaintiff's ability was not persuasive, he considered the opinions of the two state-agency physicians,

who found Plaintiff had "the necessary . . . physical residual functional capacity to perform work" in that each assessed Plaintiff capable of occasionally lifting and/or carrying fifty (50) pounds and frequently lifting and/or carrying twenty-five (25) pounds (R. 20, 130, 198).

The ALJ was correct in his treatment of the VE's responses to the hypothetical questions which included Plaintiff's working "½ the time or ½ the workday" and lifting no more than ten (10) pounds (Plaintiff's brief at p. 17). His consideration and assessment of the opinions of Dr. Steward, Ms. Allen-Henderson, and Dr. Boyce were comprehensive and were properly relied upon in making his decision.

The undersigned, based upon the above discussion, finds there is substantial evidence to support the ALJ's decision relative to the VE. Specifically, the undersigned finds the ALJ's hypothetical questions to the VE were not incomplete or inadequate but contained all Plaintiff's limitations and the ALJ did not err in his assessment or treatment of the VE's responses to hypothetical questions, which included Plaintiff's working one-half the time or one-half the workday and lifting no more than ten (10) pounds.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Judgment on the Pleadings be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District

Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __7__ day of July, 2005

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE