**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

HENRY L. ROBY,

        **Plaintiff,**

v.                      **CIVIL ACTION NO. 1:04CV161**
                                **(Judge Keeley)**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        **Defendant.**

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on July 23, 2004, the Court referred this Social Security action to United States Magistrate John S. Kaull with directions to submit proposed findings of fact and a recommendation for disposition. On July 7, 2005, Magistrate Kaull filed his Report and Recommendation and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the Report and Recommendation. On July 9, 2005, plaintiff, Henry L. Roby, through counsel, Monte Van Nostrand, filed objections to the Magistrate's Report and Recommendation.

**I.  PROCEDURAL BACKGROUND**

On February 12, 2002, Roby applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") alleging

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

disability from August 24, 2001, due to degenerative discs, bulging disc and shoulder and neck pain. The Commissioner denied the claim initially and upon reconsideration. Roby requested a hearing and on April 22, 2003, an Administrative Law Judge ("ALJ") conducted a hearing at which Roby, represented by Montie VanNostrand, Esquire, appeared and testified. A vocational expert ("VE") also testified.

On June 24, 2003, the ALJ found that Roby was not disabled. The Appeals Council denied Roby's request for review making the ALJ's decision the final decision of the Commissioner. On July 23, 2004, Roby filed this action seeking review of the final decision.

## II.  **PLAINTIFF'S BACKGROUND**

At the time of the ALJ's decision, Roby was fifty-three (53) years of age. Roby had graduated from high school and has past work experience as a carpenter assistant, laborer and logger. On September 14, 2001, Roby stopped working due to pain.

## III.  **ADMINISTRATIVE FINDINGS**

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found:

1.    Roby met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Section 216(i) of the Social Security Act and was insured for benefits through the date of this decision;

2. Roby had not engaged in substantial gainful activity since the alleged onset of disability;

3. Roby has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations (20 CFR §§ 404.1520(b) which do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4;

4. Roby's testimony and allegations were partially credible except regarding the severity of his impairments and symptoms and their effect on his functional abilities;

5. Roby has the following residual functional capacity. He can lift up to 50 pounds of weight and can engage in a good deal of standing, walking, and sitting. He can perform jobs that do not require good depth perception or good peripheral vision, driving or traveling as part of the job; permit him to change positions briefly for one to two minutes at least every hour; do not require reading or writing above a third grade level; and do not involve significant workplace hazards such as heights or dangerous moving machinery; are unskilled jobs involving simple one to three step job tasks; do not involve the general public or close interaction with co-workers or supervisors; do not involve fast-paced or assembly line work; are modestly flexible work without hard deadlines or quotas; allow him to be absent up to two days per month; and have initial supportive supervision;

6. Roby is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965);

7. Roby is an "individual closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963);

8. Roby has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964);

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

9.   Roby has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968);

10.  Roby has the residual functional capacity to perform a significant range of medium work (20 CFR §§ 416.967) and there are a significant number of jobs in the national economy that he could perform, including: work as a commercial cleaner, equipment washer, mail clerk and janitor; and

11.  Roby was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

## IV.   **PLAINTIFF'S OBJECTIONS**

Roby objects to the Magistrate Judge's report and recommendation contending that: 1) the ALJ did not consider the exacerbating effect of his diabetes on his back injury; 2) the ALJ did not properly assess his complaints of pain and, therefore, the credibility analysis was incorrect; 3) the ALJ did not assign appropriate weight to the opinions of Dr. Boyce, his treating physician; 4) the ALJ did not assign proper weight to the opinions of the examining psychologists regarding his specific mental functional limitations; 5) the ALJ's residual functional capacity ("RFC") did not include all of his limitations; 6) the ALJ's hypothetical question was incomplete; and 7) the ALJ's decision was not supported by substantial evidence.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

### V.   <u>MEDICAL EVIDENCE</u>

The medical evidence of record includes:

1. A December 15, 1998, Braxton Community Health Center report indicating complaints of swelling and pain in the left hand due to involvement in a motor vehicle accident. The report also indicated that Roby's neck was supple and had a full range of motion;

2. A December 22, 1998, Braxton Community Health Center report indicating complaints of a stiff neck, back going out when he stood, and a painful, swollen knee. The report noted that none of these complaints were mentioned on December 15, 1998. The examining physician noted cervical spine tenderness, diagnosed cervical myofascial strain and prescribed Norflex, heat and neck rest;

3. A January 21, 1999, Braxton Community Health Center report from Goutam Shome, M.D., indicating "some pain in the left knee with movements." Dr. Shome observed "mild tenderness in the medial aspect of the left knee, no swelling, or redness or deformity", normal range of motion in the left knee and dizziness when lying down. Dr. Shome ordered a CT of Roby's head, a barium x-

ray of the colon, and prescribed Antivert for dizziness and tylenol for pain;

4.   A February 3, 1999, Braxton Community Health Center report indicating complaints of knots under the skin of his left knee and requesting results of the CT and barium x-ray.  The report noted decreased range of motion of the left knee, positive point tenderness medial left knee and medial suprapatellarly with sharp/dull pain. The doctor prescribed Metamucil and Naproxen;

5.   An October 26, 1999, report from Paul Lattimer, D.C., indicating complaints of low back and right leg pain because he had "twisted self" the previous day. Dr. Lattimer diagnosed acute lumbar sprain/strain with limited range of motion;

6.   A November 24, 1999, Braxton Memorial Hospital report indicating pain in the left shoulder caused by a "tree limb kicking back and hitting the shoulder".  There was normal motor and sensory function, normal proximal and distal joint, no tendon injury, and full range of motion.   The physician diagnosed a left shoulder contusion;

7.   An August 24, 2001, the alleged onset date, report from Carroll County General Hospital indicating complaints of neck and lower back pain due to an automobile accident that same date.

6

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Examination revealed his neck was supple and non tender, his extremities were not tender or swollen, normal range of motion and stability, and a tender back and neck with no spasms. The physician diagnosed cervical strain/sprain and low back strain and prescribed ice pack, trauma collar and Motrin. An x-ray revealed no cervical spine fracture or subluxation and mild cervical spondylosis;

8.   A September 24, 2001, report from W.  D.  Lohr, D.C., Elk River Chiropractic Center indicating restrictions in sitting, bending, lifting, flexion, extension and computer work and instructions to use ice;

9.   A September 26, and September 28, 2001, report from Elk River Chiropractic Center indicating treatment for headaches and pain in his upper neck, lower neck, upper back, shoulder, mid back, and low back;

10.  Reports from Elk River Chiropractic Center dated October 1, October 3, October 5, October 8, October 10, October 12, October 15, October 17, October 19, October 22, October 26, October 29, and November 2, 2001 indicating treatment for upper, mid and lower back pain and headaches. All of the reports indicate that Roby continued "to progress";

7

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

11.  A November 6, 2001, cervical spine MRI report from John
Anton, M.D., indicating "normal vertebral body height and alignment
present without evidence for acute fracture, dislocation or
subluxation . . . no evidence for significant disc bulge or disc
herniation . . . [no] evidence for spinal stenosis . . . [and]
normal signal seen within the spinal cord and exiting nerve roots."
Dr. Anton's impression was a normal cervical spine MRI;

12.  A November 9 and November 12, 2001 report from Elk River
Chiropractic Center indicating continued treatment;

13.  A November 13, 2001, lumbar spine MRI report indicating
"asymmetric disc bulge at L4-5 on the left with mild narrowing of
the left nueral foramina" and "small annular fissure at L5-S1 . .
. [and] no evidence for canal stenosis at this level";

14.  Reports dated November 14, November 16, and November 30,
2001, from Elk River Chiropractic Center indicating continued
treatment and continued progress;

15.  A December 3, 2001, Attending Physician's Disability
Certification Return to Work Recommendations form from Dr. Lohr
indicating Roby was disabled and unable to work from September 24,
2001, to January 4, 2002;

16.  Reports dated December 5, December 10, December 21, 2001, January 9, and January 10, 2002 from the Elk River Chiropractic Center indicating continued treatment and continued progress;

17.  A January 14, 2002, report from Elk River Chiropractic Center, indicating "neck and shoulder much improved" but that Roby was disabled and should not work until February 4, 2002;

18.  Reports dated January 18, January 21, January 25, January 30, February 8, February 13, and February 18, 2002, from Elk River Chiropractic Center indicating continued treatment with favorable response;

19.  A February 20, 2002 report from the emergency department of Braxton County Memorial Hospital indicating treatment for low back and neck pain.  The examining physician noted that Roby was in acute pain and moderate distress, that his neck was supple and there was no "JVD," no thyromegally, no tenderness, no bruits in the neck, and that his gait and spine were normal.  The doctor diagnosed "chronic lumbar pain", prescribed Tylenol and Flexeril and instructed Roby to follow up with his family physician;

20.  A February 22, 2002, Attending Physician's Disability Certification Return to Work Recommendations form from Dr. Lohr at

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Elk River Chiropractic Center indicating Roby was disabled and unable to return to work until March 18, 2002;

21. Reports dated February 25, February 27, March 1, and March 13, 2002 indicating continued chiropractic treatment at Elk River Chiropractic Center with favorable response;

22. A March 6, 2002, report from Joe Boyce, D.O., at Braxton Community Health Center indicating that the manipulation provided by Dr. Lohr "temporarily" eased the pain. Dr. Boyce diagnosed lumbar strain and prescribed Lortab 5/500 and Restoril 7.5 mg;

23. A March 20, 2002, "Physician's Summary" from Dr. Lohr to the West Virginia Department of Human Services" indicating a diagnosis of "cervical sprain/strain, injury to cervical nerves, injury to dorsal nerves, lumbar sprain/strain" and listing prognosis as "fair" and stating Roby was temporarily totally disabled until May 20, 2002;

24. Reports dated March 22, March 25, March 27, April 1, April 3, April 5, April 8, and April 12, 2002 indicating continued chiropractic treatment at the Elk River Chiropractic Center with continued progress;

25. An April 12, 2002, report from Dr. Boyce at Braxton Community Health Center indicating treatment for an injury to the

10

back from "cleaning cow manure out of yard." He observed Roby appeared "comfortable." Dr. Boyce diagnosed somatic dysfunction and lumbar strain and prescribed Lorcet 5/500 and Restoril 15mg;

26. Reports dated April 12, April 15, April 19, April 26, April 29, May 5, 2002 indicating continued chiropractic treatment at the Elk River Chiropractic Center with continued progress;

27. A May 8, 2002, report from Elk River Chiropractic Center indicating Roby was "doing much better";

28. A May 25, 2002, physical evaluation report from Arturo Sabio, M.D. indicating normal HEENT, neck, cardiovascular, chest functions, abdomen, extremities, spinal curvature, and neurological examinations, tender spinous processes of spine, no kyphosis or scoliosis. A range of motion examination revealed: 1) cervical – lateral flexion was 45 degrees bilaterally, flexion was 60 degrees, extension was 75 degrees, and rotation is 80 degrees bilaterally; 2) shoulders – abduction was 180 degrees bilaterally, forward flexion was 180 degrees bilaterally; adduction was 50 degrees bilaterally, internal rotation was 40 degrees bilaterally and external rotation was 90 degrees bilaterally; 3) elbows – flexion was 150 degrees bilaterally, extension was 0 degrees bilaterally, supination was 80 degrees bilaterally, and pronation was 80 degrees

bilaterally; 4) wrists – dorsiflexion was 60 degrees bilaterally, palmar flexion was 70 degrees bilaterally, radial deviation was 20 degrees bilaterally, and ulnar deviation was 30 degrees bilaterally; and 5) hands – all joints allow 90 degrees of flexion bilaterally and zero degrees of extension.

Dr. Sabio diagnosed degenerative disc disease, and chronic back pain, and "probably" amblyopia[1] of the left eye. In his summary, Dr. Sabio opined that Roby's gait was normal, that he did not require any aid in ambulation, that he was stable at station, that he could walk on the heels, on the toes and heel-to-toe and in tandem, stand on either leg separately and squat fully. Dr. Sabio observed tenderness of lumbar spine and Roby indicated "pain in the lumbar spine on straight leg raising." He noted Roby "did not want to go beyond 45 degrees of straight leg raising on either side because of the pain in the lumbar spine" and "was able to flex his hips to 100 degrees bilaterally with pain in the lumbar spine." Dr. Sabio opined that the "range of motion [was] otherwise normal in the rest of the joints of the spine and the upper and lower

---

[1] Amblyopia: impairment of vision without detectable organic lesion of the eye. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 57.

extremities," as were his deep tendon reflexes and sensory and motor abilities;

29.  Reports dated May 29, and June 3, 2002 from Elk River Chiropractic Center indicating continuing treatment and progress;

30.  A June 6, 2002, Physical Residual Functional Capacity Assessment (RFC) from Thomas Lauderman, D.O., a state agency physician, indicating Roby could occasionally lift and/or carry fifty (50) pounds, frequently lift and/or carry twenty-five (25) pounds, stand and/or walk for a total of about six (6) hours in an eight (8) hour workday, sit with normal breaks for a total of about six (6) hours in an eight (8) hour workday, and push and/or pull unlimited, and no postural, manipulative, visual, communicative, or environmental limitations;

31.  Reports dated June 7, June 12, June 16, June 21, June 26, July 1, July 8, July 15, July 17, July 19, July 22 and July 26, 2002 indicating treatment at the Elk River Chiropractic Center for back and neck pain with continued progress;

32.  A July 29, 2002, "General Physical" report from Dr. Boyce to the West Virginia Department of Health and Human Resources indicating normal neck, neurological, orthopedic, and arteriosclerosis examinations, 20/30 vision in the right eye and

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

20/200 in the left without corrective lenses. Dr. Boyce's diagnosis was chronic back pain, blurred vision and hemorrhoids. Dr. Boyce further indicated that Roby could perform sedentary full time work at light duty;

33.  An August 19, 2002 report from Dr. Lohr's chiropractic treatment indicating that Roby felt "not too bad, neck much better again";

34.  An August 21, 2002, "Routine Abstract Form Physical" from Dr. Boyce regarding an August 6, 2002 examination indicating normal gait and station, fine motor ability, gross motor ability joints of all extremities and muscle bulk, abnormal range of motion in his back and neck and normal reflexes, sensory deficits, motor strength, coordination, frequency of seizures and mental status;

35.  Reports dated August 23 and August 28 indicating continued chiropractic treatments from Dr. Lohr and noting that Roby reported that he was "not too bad" and his neck was "much better again";

36.  An August 30, 2002, RFC report from Cynthia Osborne, D.O., a state agency physician, indicating Roby could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six

14

(6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; unlimited ability to push/pull; and no postural, manipulative, visual, communicative, or environmental limitations. Dr. Osborne determined Roby's RFC was for work at the medium level;

37. Reports dated September 6, September 13, September 18, September 23, September 30, October 4, October 9, October 14, and October 21, 2002 indicating chiropractic treatment from Dr. Lohr with continued progress;

38. An October 28, 2002, report from Dr. Boyce at Braxton Community Health Center indicating follow-up treatment for lumbar disc disorder and insomnia. Roby reported "still having lumbar pain," but experiencing "some relief from chiropractor" and Lortab, sleeping "better" with Restoril, and neck had "no lymphadenopathy." Dr. Boyce diagnosed lumbar disc disease and prescribed Lorcet 10/650 and Restoril 30mg;

39. A November 1, 2002, report from Dr. Lohr indicating continued chiropractic treatment and that Roby was "doing fair";

40. A November 1, 2002 report from Dr. Boyce indicating laboratory test results resulting in a diagnosis of "new onset"

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

diabetes mellitus, Type 2[2] and reported erectile dysfunction.  Dr.

Boyce prescribed Avandia 4mg, Glucotrol XL, and Viagra;

41.  Reports dated November 6, November 11, November 15,

November 20, December 2, and December 9, 2002 from Dr. Lohr

indicating continued chiropractic treatments;

42.  A December 12, 2002, "General Physical" form from Dr.

Boyce completed for the West Virginia Department of Health and

Human Resources regarding Roby's "back problem and sugar" and

indicating Roby's distant vision without glasses was 20/25 in his

right eye and 20/200 in the left eye, a normal neck examination,

neurological examination with no "pupilar response to direct light

of OS," and an orthopedic examination with a decreased range of

motion of his back. Dr.  Boyce noted Roby reported "diffuse low

back pain" and diagnosed lumbar disc disease and acute monocular

blindness (major) and type 2 diabetes (minor).

Dr.  Boyce determined Roby could not lift more than ten (10)

pounds or climb heights, that he lacked depth perception and that

---

[2]d.  mellitus, Type II: one of the two major types of diabetes
mellitus, characterized by peak age of onset between 50 and 60
years, gradual onset with few symptoms of metabolic disturbance
(glycosura and its consequences), and no need for exogenous
insulin; dietary control with or without oral hypoglycemics is
usually effective.  *Dorland's Illustrated Medical Dictionary*, 29th
Ed., 2000, at 489.

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Roby would be unable to work full time for more than one (1) year. Dr. Boyce recommended an MRI of the head, cervical spine, and lumbar spine and treatment with analgesics and hypoglycemics;

43. Reports dated December 16 and December 20, 2002, indicating continued chiropractic treatment from Dr. Lohr;

44. A January 20, 2003, report from Dr. Boyce indicating complaints that "his neck and back [had] been bothering him." Dr. Boyce noted Roby's blood sugar was 221. He diagnosed type 2 diabetes, somatic dysfunction, and monocular blindness and prescribed Glucotrol 5mg;

45. A February 18, 2003, report from Dr. Boyce indicating complaints of his "back still bothering him" and "still . . . having [left] eye blindness." Dr. Boyce referred Roby to John K. Lackey, D.O., F.A.A.O., an ophthalmologist, and scheduled an appointment for March 3, 2003;

46. A March 3, 2003 report from Dr. Lackey indicating vision was assessed as 20/20 in the right eye and 20/400 in the left eye due to cataracts. Dr. Lackey scheduled surgery to remove the cataracts for March 25, 2003; however, a notation on Dr. Lackey's office record indicates that Roby "cancelled surgery . . . will reschedule – he spoke to hospital";

17

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

47.  A March 11, 2003, psychological evaluation from Frances Allen-Henderson, MA, LSW, and her supervisor, L. Andrew Steward, Ph.D., both licensed psychologists, indicating complaints of "'lower back neck problems,'" "'bulging discs in the neck and back, migraine headaches,'" diabetes, and being "legally blind in his left eye" for two years. The diagnostic impressions were: 1) Axis I – major depressive disorder, recurrent, moderate; 2) Axis II – deferred; 3) Axis III – review of medical record; 4) Axis IV – occupational problems; and Axis V – 56.  The doctors recommended that Roby:  1) "seek mental health treatment"; 2) "learn and utilize deep breathing/relaxation and new coping skills"; and 3) "continue to seek medical treatment and perhaps referral to a pain management center would be helpful".

Ms. Allen-Henderson and Dr. Steward also completed a "Mental Residual Functional Capacity Assessment of Work Related Abilities" that indicated the following limitations:

1) <u>moderate limitations</u> in understanding, remembering, and carrying out short or detailed instructions;

2) <u>no limitations</u> in his ability to exercise judgment or make simple work related decisions;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

3) <u>slight limitations</u> in his ability to sustain attention and concentration for extended periods;

4) <u>moderate limitations</u> in his ability to maintain regular attendance and punctuality;

5) <u>moderate limitations</u> in his ability to complete a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks;

6) <u>moderate limitations</u> in his ability to interact appropriately with the public and slightly limited in his ability to respond properly to direction and criticism from his supervisors and work in coordination with others without being unduly distracted by them;

7) <u>no limitations</u> in ability to maintain acceptable standards of grooming and hygiene;

8) <u>slight limitations</u> in ability to work in coordination with others without unduly distracting them and to demonstrate reliability, and <u>slight limitations</u> in ability to ask simple questions or request assistance;

9) <u>moderate limitations</u> in ability to maintain acceptable standards of courtesy and behavior and relate predictably in social situations in the workplace;

10) <u>slight limitations</u> in his ability to respond to changes in the work setting and to be aware of normal hazards; and

11) <u>moderate limitations</u> in his ability to tolerate ordinary work stress. Ms. Allen-Henderson and Dr. Steward opined that Roby's limitations had existed since September, 2001.

Ms. Allen-Henderson and Dr. Steward also completed a Psychiatric Review Technique and indicated Roby had no organic mental disorders, schizophrenic, paranoid, and other psychotic disorders, mental retardation, anxiety-related disorders, somatoform disorders, personality disorders, substance addiction disorders, or autism and other pervasive disorders. They noted that Roby did have affective disorders in the form of depressive syndrome, characterized by sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, or thoughts of suicide.

Based on Roby's own report, Ms. Allen-Henderson and Dr. Steward noted the following degrees of limitations as to

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

functionality: 1) <u>mild restrictions</u> to activities of daily living;

2) <u>moderate difficulties</u> in maintaining social functioning; and 3)

<u>moderate difficulties</u> in maintaining concentration, persistence, or

pace. They also noted that Roby had reported three repeated

episodes of decompensation, each of extended duration[3]; and

48. A March 18, 2003, report from Dr. Boyce indicating

Roby's blood sugar was 258. Dr. Boyce diagnosed type 2 diabetes,

low back pain, and diabetic neuropathy and directed Roby to closely

monitor his diabetes. Roby reported that his monocular blindness

was due to a cataract which was to be removed.

## VI. DISCUSSION

A. <u>Effect of diabetes</u>

Roby contends that "the ALJ failed to consider the

exacerbating effect of his diabetes on his back injury." At step

three of the sequential evaluation, the ALJ determined that the

> diabetes does not meet or equal the
> requirements of any listing section of
> Appendix 1. There is no evidence in the
> record of significant problems from diabetes
> or any end organ damage.

---

[3]     Significantly, Ms. Allen-Henderson and Dr. Steward do not
provide any documentation in their report to support this
conclusion and, other than this self-reported reference of Roby,
the record contains no documentation of any periods of
decompensation.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

As noted above, on November 1, 2002, Dr. Boyce diagnosed "d. mellitus, Type II," which is a diabetes that can be controlled through proper diet. Dr. Boyce prescribed Avandia 4mg and Glucotrol XL. However, there is no indication in the record that Roby was given a restricted diet or given instructions regarding his diet.

At the administrative hearing, Roby testified he had been prescribed Avandia and Amaryl, which caused a reduction in his blood sugar level and confirmed that Dr. Boyce had not instructed him as to the proper diet for controlling his diabetes. Roby did state that he does not "eat as much sweets . . . or drink as many pops . . . ."

The evidence in the record regarding the testing for diabetes indicates a diagnosis of type 2 diabetes, but does not indicate the implementation of any dietary restrictions; rather medications were prescribed to reduce the blood sugar level.  Significantly, the record does not contain any evidence of significant problems from diabetes or any end organ damage. Because there is no evidence in the record that the diabetes caused Roby any functional limitation, the Magistrate Judge determined that the ALJ properly considered the effect of the diabetes on Roby's impairments and his ability to

22

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

work and found that the record contains substantial evidence to

support the ALJ's findings. The Court agrees.

B.    Credibility Analysis

Roby next contends that the evidence of record does not

support the ALJ's credibility analysis pursuant to SSR 96-7p.

SSR 96-7p provides, in part:

> PURPOSE: The purpose of this Ruling is to
> clarify when the evaluation of symptoms,
> including pain, under 20 CFR 404.1529 and
> 416.929 requires a finding about the
> credibility of an individual's statements
> about pain or other symptom(s) and its
> functional effect; to explain the factors to
> be considered in assessing the credibility of
> the individual's statements about symptoms;
> and to state the importance of explaining the
> reasons for the finding about the credibility
> of the individual's statements in the
> disability determination or decision. In
> particular, this Ruling emphasizes that:
>
> 1.    No symptom or combination of symptoms can
> be the basis for a finding of disability, no
> matter how genuine the individual's complaints
> may appear to be, unless there are medical
> signs and laboratory findings demonstrating
> the existence of a medically determinable
> physical or mental impairment(s) that could
> reasonably be expected to produce the
> symptoms.
>
> 2.    When the existence of a medically
> determinable physical or mental impairment(s)
> that could reasonably be expected to produce
> the symptoms has been established, the
> intensity, persistence, and functionally

23

limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

individual's statements and the reasons for
that weight.

In <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996), the Fourth

Circuit developed a two-step process for determining whether a

person is disabled by pain or other symptoms:

> 1)  For pain to be found to be disabling,
> there must be shown a medically determinable
> impairment which could reasonably be expected
> to cause not just pain, or some pain, or pain
> of some kind or severity, but *the pain the
> claimant alleges she suffers.* The regulation
> thus requires at the threshold a showing by
> objective evidence of the existence of a
> medical impairment "which could reasonably be
> expected to produce the actual pain, in the
> amount and degree, alleged by the claimant."
> *Cf. Jenkins*, 906 F.2d at 108 (explaining that
> 42 U.S.C. § 423(d)(5)(A) requires "objective
> medical evidence of some condition that could
> reasonably be expected to produce the pain
> alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2)  It is only after a claimant has met her
> threshold obligation of showing by objective
> medical evidence a medical impairment
> reasonably likely to cause the pain claimed,
> *that the intensity and persistence of the
> claimant's pain, and the extent to which it
> affects her ability to work, must be
> evaluated,* See 20 C.F.R. §§ 416.929(c)(1) &
> 404.1529(c)(1). Under the regulations, this
> evaluation must take into account not only the
> claimant's statements about her pain, but also
> "all the available evidence," including the
> claimant's medical history, medical signs, and
> laboratory findings, *see id.;* any objective
> medical evidence of pain (such as evidence of

25

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

> reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, *supra* at 594.

Step one requires the ALJ to determine whether there is a medically determinable condition that could reasonably be expected to produce the alleged symptoms. Here, the ALJ found: "The medical evidence establishes the existence of some impairments reasonably expected to produce some of the symptoms and limitations alleged by the claimant." Thus, the ALJ satisfied the first prong of the credibility analysis.

Step two requires the ALJ to examine how the intensity, persistence and functional limitations of Roby's symptoms of pain relate to his ability to do basic work activities. The ALJ considered objective medical evidence, statements and other information provided by treating or examining physicians and psychologists, and Roby's own testimony regarding his symptoms.

The objective medical evidence included results of an August 24, 2001 x-ray which indicated "no fracture or subluxation,

no significant degenerative disc disease, and only mild cervical spondylosis." The ALJ found that this x-ray "was within normal limits," and showed "no evidence of disc herniation or spinal stenosis involving the lumbar spine".

Next, the ALJ evaluated the November 6, 2001, cervical spine MRI and the November 13, 2001, lumbar spine MRI, and noted the results were a "normal" cervical spine and a "disc bulging at L4, L5, and the L5-S1 interspace" of the lumbar spine. The ALJ determined that the "[d]iagnostic testing involving the cervical spine and lumbar spine did not show any severe spinal impairments".

The ALJ also considered the statements and other information from the examining physicians, the treating physician, and the consultative psychologists regarding Roby's symptoms. Specifically, he noted the opinion of Dr. Sabio, an examining physician, regarding Roby's normal x-ray, normal cervical spine MRI, lumbar spine MRI indicating "asymmetric disc bulge at L4-5 on the left with mild narrowing of the left nueral foramina" and "small annular fissure at L5-S1 . . . [and] no evidence for canal stenosis at this level," and examination indicating a normal gait, "normal muscle strength in all four extremities" and normal neurological examination, as well as Dr. Sabio's diagnosis of "degenerative

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

disc disease and amblyopia of the left eye". Significantly, Dr. Sabio did not document debilitating pain due to any impairment or combination of impairments.

The ALJ also considered the treatment records from Braxton Community Health Center and noted that Roby's "most recent examination on August 6, 2002, was within normal limits." Specifically, on August 6, 2002, Roby had normal gait and station, fine motor ability, gross motor ability joints of all extremities, normal muscle bulk, reflexes, sensory deficits, motor strength, coordination, frequence of seizures, respiratory, cardiovascular, digestive functions and mental status and had an abnormal range of motion in his back and neck. However, the examiner did not assess a condition that would create the type of pain which Roby alleges.

Additionally, the ALJ considered the opinion of the ophthalmologist regarding Roby's vision. According to the evidence in the record, Roby's monocular blindness of the left eye was caused by a cataract that Roby intended to have surgically corrected. The ophthalmologist never opined that he expected the monocular blindness would continue after surgery.

The ALJ also considered the opinions of the consulting psychologists, Ms. Allen-Henderson and Dr. Steward and noted:

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

A mental status examination was within normal
limits. WAIS-III testing was conducted and
the claimant had IQ scores ranging from 74 to
97. After further evaluation, the diagnoses
were a moderate, recurrent, major depressive
disorder, polysubstance dependence in
remission, and a reading disorder. The
claimant's global assessment of functioning
was estimated to be 56. Dr. Steward also
completed a mental functional assessment
rating the claimant's functional limitations
as generally 'slight' to 'moderate' though the
PRTF also noted three extended
decompensations.

After considering the opinion and functional assessment of Ms.

Allen-Henderson and Dr. Steward, the ALJ concluded at step three:

The claimant has alleged depression and
anxiety that are evaluated under listing
sections 12.04 and 12.06 of Appendix 1.
However, the claimant does not require
treatment from a mental health professional.
Sections 12.04B and 12.06B require an
evaluation of psychiatric functional
limitations with marked or extreme functional
limitations in at least two functional
categories. The first functional category
involves restriction of activities of daily
living. The undersigned finds that the
claimant has only mild limitation in his
functional category. The claimant is
independent with activities of daily living,
and he is able to perform activities outside
his home. The next functional category
involves difficulties in maintaining social
functioning. The claimant may have moderate
limitation in this function category; however,
the psychological examination did not note any
severe problems involving social functioning
(Exhibit 14F). [Plaintiff] is able to perform

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

activities outside his home requiring interactions with others. The undersigned finds that the claimant may have mild limitations involving concentration, persistence, or pace. Dr. Steward indicated that the claimant had above average attention and slightly below average concentration (Exhibit 14F, page 5). The claimant also had a verbal IQ score of 97. There is no indication that the claimant would be unable to perform at least unskilled job tasks. Additionally, there have been no documented episodes of decompensation of extended duration, despite the contrary notation of Dr. Steward. Mr. Roby has not required any psychiatric hospitalizations, and he does not require even episodic treatment from a mental health professional. In summary, the claimant does not have any marked or extreme functional limitations. His impairments also do not meet the "C" criteria requirements of Sections 12.04 or 12.06. The claimant's impairments and symptoms do not meet or equal any psychiatric listing section of Appendix 1, and the claimant has the mental functional ability to perform unskilled work.

20 C.F.R. Subpt. P. App. 1, 12:00(C)(4) provides:

Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationship, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

significant alteration in medication; or
documentation of the need for a more
structured psychological support system (e.g.
hospitalizations, placement in a halfway
house, or a highly structured and directing
household); or other relevant information in
the record about the existence, severity, and
duration of the episode.

The term *repeated episodes of decompensation,
each of extended duration* in these listings
means three episodes within 1 year, or an
average of once every 4 months, each lasting
for at least 2 weeks. If you have experienced
more frequent episodes of shorter duration or
less frequent episodes of longer duration, we
must use judgment to determine if the duration
and functional effects of the episodes are of
equal severity and may be used to substitute
for the listed finding in a determination of
equivalence.

Here, the ALJ concluded that Roby's mental condition could not
reasonably be expected to cause the symptoms alleged because there
were no documented episodes of decompensation of extended duration,
psychiatric hospitalizations or treatment from a mental health
professional. Therefore, the ALJ determined that Roby demonstrated
"mild limitations" to his activities of daily living, "moderate
limitations" to his degree of social functioning, and "mild
limitations" as to his concentration, persistence or pace.

Finally, the ALJ considered Roby's own statements about his
pain and noted:

31

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

At the hearing, [Plaintiff] alleged low back
pain, headaches, hand swelling, and neck pain.
The claimant takes hydrocodone for pain.  He
indicated that medications make his pain
bearable. He alleged that he does not have
money for medical treatment. The claimant also
has diabetes. [Plaintiff] alleged constant
pain worsened by prolonged sitting and
standing.  The claimant is able to walk less
than one mile, sit for an hour at a time,
stand for 30 minutes, and lift a gallon of
milk.  He alleged that he will sometimes drop
items.  The claimant is blind in the left eye.
Regarding daily activities, [Plaintiff]
testified that he spends most of the day in a
recliner.  He sometimes visits his brother and
a friend.  He is able to care for his own
personal needs.  The claimant was able to go
hunting once and go fishing twice in 2002.
The claimant attends church two or three times
per week.  He watches television and will
occasionally go to a restaurant.  The claimant
indicated that he re-injured his back last
month after picking up a piece of wood to put
in his brother's wood stove.  [Plaintiff]
alleged depression but he does not receive any
psychiatric treatment. The claimant alleged
frequent headaches, reduced energy, sleep
disturbance, right arm numbness, and leg
cramps.

The undersigned [ALJ] finds the testimony
partially credible except regarding the
severity of the claimant's impairments and
symptoms and their effect on his functional
abilities. The medical evidence establishes
the existence of some impairments reasonably
expected to produce some of the symptoms and
limitations alleged by the claimant. However,
treatment records do not substantiate the
claimant's allegations of severe symptoms or
functional problems. The claimant alleged he

32

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

was unable to lift over 10 pounds, however, he
indicated that he threw his back out shoveling
cow manure in a field and again lifting a
large block of wood. Despite his impairments
and symptoms, the claimant is able to care for
his own personal needs, drive a car, and
attend church. He was able to go hunting and
fishing in 2002, during the time he alleged
disability. The claimant has not required
significant treatment for his back. He has
only required conservative treatment, and
there is no evidence of a severe spinal
disorder. Physical examinations and
neurological examinations have been within
normal limits. A detailed consultative
examination was within normal limits (Exhibit
3F). Additionally, the claimant has the mental
functional ability to perform at least
unskilled job tasks. He does not require
psychiatric treatment and has never required
psychiatric hospitalization.

It is clear that the ALJ properly reviewed, evaluated and
considered all the evidence of record prior to making his
credibility analysis, and followed the two-prong analysis set forth
in Craig. Therefore, the Magistrate Judge determined that the ALJ
did not err in his assessment of Roby's complaints of pain pursuant
to SSR 96-7p, and determined that the evidence of record contains
substantial evidence to support the ALJ's credibility analysis.
The Court agrees.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

C.  Weight Assigned to the Opinions of the Treating Physician, Dr. Boyce

Roby asserts that, in weighing the opinions of Dr. Boyce, his treating physician, the ALJ should have applied SSR 96-2p, which provides:

> A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.
>
> Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.
>
> Controlling weight may not be given to a treating source's medical opinion unless the opinion is well- supported by medically acceptable clinical and laboratory diagnostic techniques.
>
> Even if a treating source's medical opinion is well- supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.
>
> The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.
>
> If a treating source's medical opinion is well- supported and not inconsistent with the other substantial evidence in the case record,

it must be given controlling weight; i.e., it
must be adopted.

A finding that a treating source's medical
opinion is not entitled to controlling weight
does not mean that the opinion is rejected. It
may still be entitled to deference and be
adopted by the adjudicator.

As the following demonstrates, in making his decision, the ALJ

followed SSR 96-2p:

1.    The ALJ acknowledged Dr. Boyce as the treating physician
      and noted his opinion was "entitled to appropriate
      consideration pursuant to SSR 96-2p. This acknowledgment
      satisfied the requirements of SSR 96-2p(1).

2.    The ALJ found the opinions of Dr. Boyce unpersuasive
      regarding Roby's limitations, noting:

      a.    Diagnostic testing involving the cervical spine and
            lumbar spine did not show any severe spinal
            impairment. The ALJ based this conclusion on a
            normal x-ray of the cervical spine; a normal MRI of
            the cervical spine; and a MRI of the lumbar spine,
            which showed "disc bulging" and L5-S1 "interspace".
            This evidence satisfied the requirement of SSR 96-
            2p (2);

      b.    There is no evidence in the record of neurological
            deficits. The ALJ relied on the finding of Dr.
            Sabio, who opined on May 25, 2002, that Roby's
            "neurological examination was normal". This
            finding, and the supporting criteria, satisfied the
            requirement of SSR 96-2p(3); and

      c.    There are no medical findings in the record to
            support [Dr. Boyce's] change of opinion and Dr.
            Boyce did not provide objective findings to justify
            his December 12, 2002 opinion that Roby "was unable
            to perform any work due to back pain and left eye

> blindness". The ALJ relied on the opinions of the
> two state-agency physicians who found that Roby
> could occasionally lift and/or carry fifty (50)
> pounds and frequently lift and/or carry twenty-five
> (25) pounds. The ALJ also relied on the opinion of
> the ophthalmologist that Roby's vision was normal
> in his right eye and that the monocular blindness
> of the left eye was caused by a cataract, which was
> to be surgically removed. These findings, and the
> supporting evidence of record, satisfied the
> requirement of SSR 96-2p(3).

In order to conform with SSR 96-2p(5) and (6), even though the

treating physician's medical opinion was not well-supported and is

inconsistent with other substantial evidence in the record, the ALJ

did treat it with deference.

Thus, it is clear that, pursuant to SSR 96-2p, the ALJ relied

on the clinical findings of record and the medical opinions of Dr.

Sabio, the state-agency physicians, and Dr. Lackey in properly

considering and evaluating the opinion of Dr. Boyce, the treating

physician, and did not improperly substitute his own opinion for

that of the treating physician.

In <u>Craig v. Chater</u>, 76 F.3d 585, 590(4th Cir. 1996), the

Fourth Circuit held:

> Circuit precedent does not require that a
> treating physician's testimony 'be given
> controlling weight.' <u>Hunter v. Sullivan</u>, 993
> F.2d 31, 35 (4th Cir. 1992). In fact, 20
> C.F.R. § 404.1527(c)(2) and 416.927(d)(2)
> (emphasis added) both provide,

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

> [4,5] By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

The record does not contain "any medical findings" to support the December 12, 2002 opinion of Roby's treating physician, Dr. Boyce, that Roby "was unable to perform work due to low back pain and left eye blindness." The evidence of record regarding Roby's limitations does demonstrate disc bulges and interspacing of the spine, elevated blood sugar, which created no "significant problems" or "any end organ damage", and monocular blindness caused by cataract, which was scheduled for removal. Therefore, the Magistrate Judge determined that the ALJ properly considered the opinion of the treating physician and was correct in not assigning it controlling weight. The Court agrees.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

D.    <u>Opinions of the Examining and Treating Physicians</u>

Roby contends that the ALJ did not assign proper weight to the opinions of the examining psychologists regarding his specific mental functional limitations, improperly substituted his own opinion for that of qualified medical and mental health professionals, totally discounted the treating physician's opinion and completely ignored the opinion evidence of the examining psychologist.

As noted in section C, the Magistrate Judge determined that the ALJ considered all the evidence prior to deciding not to give Dr. Boyce's opinion controlling weight due to its inconsistency with the other evidence in the record and the lack of objective findings to support it.  The examples noted above substantially to support the ALJ's finding.

Roby also contends that the ALJ did not follow the mandates of SSR 96-6p regarding his evaluation of the state agency physicians.

SSR96-6p provides:

> 1.    Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the

administrative law judge and Appeals
Council levels of administrative review.

2.   Administrative law judges and the Appeals
     council may not ignore these opinions and
     must explain the weight given to these
     opinions in their decisions.

3.   An updated medical expert opinion must be
     obtained by the administrative law judge
     or the Appeals Council before a decision
     of   disability   based   on   medical
     equivalence can be made.

Here, the ALJ considered the opinions of the state agency
physicians and noted:

Social Security Ruling 96-6p requires that the
opinions of state agency medical . . .
consultants be treated as expert opinion
evidence from nonexamining sources.   The
undersigned is not bound by the conclusions of
these nonexamining sources, but has considered
their opinions and given them appropriate
weight in rendering this decision.   These
medical experts have indicted that the
claimant has the necessary . . . physical
residual functional capacity to perform work.
This seems correct, and these opinions are
relied upon in part.

The Magistrate Judge determined that the ALJ followed SSR 96-
6p, treated the opinions of the state agency physicians
appropriately and assigned them the appropriate weight. The Court
agrees.

Roby also contends that the ALJ failed to follow the following specific portion of SSR 96-5p:

> Nevertheless, our rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.
>
>                   . . .
>
> Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis.
>
>                   . . .
>
> Adjudicators must weigh medical source statements under the rules set out in 20 CFR 404.1527 and 416.927, providing appropriate explanations for accepting or rejecting such opinions.

After the ALJ concluded that the opinions of the treating physicians were not persuasive, Roby contends that he failed to provide objective findings to justify his opinions and should have requested clarification and further information from the treating

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

physician. As already noted, on December 12, 2002, Dr. Boyce changed his July 29, 2002 opinion regarding Roby's limitations and stated that Roby was unable to perform any work due to back pain and left eye blindness. In his opinion, the ALJ noted that "[t]here are no medical findings supporting this change of opinion, and Dr. Boyce has not provided objective findings to justify his opinions regarding the claimant's functional limitations".

The Magistrate Judge determined that the ALJ did not err in declining to request that Dr. Boyce clarify his opinion. Because the ALJ clearly was unpersuaded by Dr. Boyce's opinion, and had noted the existing x-rays, MRIs and the opinions of Dr. Sabio, Dr. Lackey, and the state agency physicians, it is clear that a sound evidentiary basis for the finding exists. The Magistrate Judge, then, determined that the ALJ was correct in relying on this evidence as his basis for evaluating the opinion of the treating physician. The Court agrees.

E.   Weight Assigned to the Opinions of the Examining Psychologists
     Regarding Roby's Specific Mental Functional Limitations

Roby asserts that the ALJ improperly substituted his own opinion for that of qualified mental health professionals and completely ignored the opinion evidence of the examining psychologist. The record indicates otherwise. The ALJ

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

systematically and thoroughly considered and evaluated the opinions

of Dr. Steward and Ms. Allen-Henderson in rendering his decision

regarding Roby's depression and anxiety.

20 C.F.R. Pt. 404, Subpt P, App1, Listing 12.06 provides:

> Anxiety Disorders: In these disorders, anxiety
> is either the predominant disturbance or is
> experienced if the individual attempts to master
> symptoms; for example, confronting the dreaded
> object or situation in a phobic disorder or
> resisting the obsessions or compulsions in
> obsessive compulsive disorders.
>
> The required level of severity for these
> disorders is met when the requirements in both
> A and B are satisfied, or when the requirements
> in both A and C are satisfied:
>
> A. Medically documented findings of at
> least one of the following:
>
>> 1. Generalized persistent anxiety
>> accompanied by three out of four of
>> the following signs or symptoms:
>>
>>> a, motor tension; or
>>> b. Autonomic hyperactivity; or
>>> c. Apprehensive expectation; or
>>> d. Vigilance and scanning;

OR

>> 2. A persistent irrational fear of a
>> specific object, activity, or
>> situation which results in a
>> compelling desire to avoid the
>> dreaded object, activity, or
>> situation; or

42

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in a least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence or pace; or

4. Repeated episodes of decompensation each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's own home.

   20 C.F.R. Pt. 404, Subpt P, Appl, 12.04 Affective Disorders provides:

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.    Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities; or
b.    Appetite disturbance with change in weight; or
c.    Sleep disturbance; or
d.    Psychomotor agitation or retardation; or
e.    Decreased energy; or
f.    Feelings of guilt or worthlessness; or
g.    Difficulty concentrating or thinking; or
h.    Thoughts of suicide; or
i.    Hallucinations, delusions or paranoid thinking; or

2.    Manic syndrome characterized by at least three of the following:
a.    Hyperactivity; or
b.    Pressure of speech; or
c.    Flight of ideas; or
d.    Inflated self esteem; or
e.    Decreased need for sleep; or
f.    Easy distractability; or

44

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulty in maintaining concentration, persistence or pace; or

4. Repeated episodes of decompensation, each of extended duration . . . .

The ALJ considered Roby's: 1) activities of daily living and found mild functional limitations; 2) social functioning and found moderate functional limitations; 3) concentration, persistence, pace, and verbal IQ, and found Roby was able to perform "at least" unskilled job tasks; and 4) Roby's episodes of decompensation, noting that the record does not contain any documentation to support the three episodes of decompensation noted by Ms. Allen-Henderson and Dr. Stewart.

The ALJ found:

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

> In summary, the claimant does not have any marked or extreme functional limitations. His impairments also do not meet "C" criteria requirements of Sections 12.04 or 12.06. The claimant's impairments and symptoms do not meet or equal any psychiatric listing section of Appendix 1 . . . .

Thus, the ALJ clearly considered and evaluated the opinion of Dr. Steward and Ms. Allen-Henderson, and did not substitute his opinion for that of the mental health professionals. Importantly, the ALJ noted that the record does not contain evidence of any psychiatric hospitalizations or even episodic treatment from a mental health professional. Significantly, the ALJ determined that Roby failed to satisfy the "C" requirements of Section 12.04 or 12.06.

Accordingly, the Magistrate Judge determined that the ALJ properly evaluated and weighed the findings of the examining mental health professionals and properly concluded that Roby does not have any marked or extreme functional mental limitations. The Court agrees.

F.  Evidence supporting the ALJ's RFC

Roby contends that "there is a lack of substantial evidentiary support for the RFC found by the ALJ in his decision, in that the ALJ impermissibly omitted without explanation the specific mental limitations identified by the examining psychologist."

46

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

20 C.F.R. §§ 404.1545 and 416.941 defines residual functional capacity as what the individual can still do despite his limitations. It is based on the relevant evidence of record, which may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of the medical condition. The ALJ may use the observations of treating physicians and psychologists regarding the limitations in formulating the RFC, and must consider these observations along with the medical records to decide to what extent the impairments prevent an individual from performing particular work activities.

Here, the ALJ determined Roby's RFC and noted:

> Based on the entire record, the undersigned [ALJ] finds the claimant retains the residual functional capacity to lift up to 50 pounds and engage in a good deal of standing, walking, and sitting. These functional abilities are consistent with a full range of medium work. The claimant's vision deficit, subjective discomfort, psychiatric symptoms, and limited academic achievement may limit him to jobs not requiring good depth perception or good peripheral vision; work not requiring driving or traveling as part of the job; jobs allowing him to change positions briefly for one to two minutes at least every hour; jobs not requiring reading or writing above a third grade level; jobs not involving significant workplace hazards such as heights or dangerous moving machinery; unskilled jobs involving simple one to three step job tasks; jobs not involving work with the general public or close interaction with co-

47

> workers or supervisors; jobs not involving fast-
> paced or assembly line work; modestly flexible
> work without hard deadlines or quotas; jobs
> allowing for up to two days absent per month;
> and jobs with initial supportive supervision (R.
> 20).

In determining Roby's RFC, the ALJ reviewed the relevant
medical evidence of record, including the reports from Dr. Steward
and Ms. Allen-Henderson, Dr. Sabio, the state-agency physicians,
and Dr. Boyce. After conducting a thorough review of the findings
of Ms. Allen-Henderson and Dr. Steward, the ALJ determined that
Roby "does not have any marked or extreme functional limitations"
from his mental limitations and has "the mental functional ability
to perform unskilled work".

Roby contends that the ALJ's RFC failed to include "ordinary
job stress, which limited his ability to tolerate a normal workday,
maintaining regular attendance and punctuality; and completing a
normal workday and workweek, up to ½ the time or ½ the workday."
However, in his decision, the ALJ did accommodate Roby's need to
avoid "ordinary job stress" and noted:

> The claimant's . . . psychiatric symptoms . . .
> may limit him to . . . jobs not requiring
> reading or writing above a third grade level; .
> . . unskilled jobs involving simple one to three
> step job tasks; jobs not involving work with the
> general public or close interaction with co-
> workers or supervisors; jobs not involving fast-

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

paced or assembly line work; modestly flexible work without hard deadlines or quotas; jobs allowing for up to two days absent per month; and jobs with initial supportive supervision.

20 C.F.R. § 404.1527 states, in part:

(d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion . . .

(1)    *Examining    relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2)    *Treatment    relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

in [the] case record, we will give it
controlling weight. When we do not
give the treating source's opinion
controlling weight, we apply the
factors listed in paragraphs
(d)(2)(i) and (d)(2)(ii) of this
section, as well as the factors in
paragraphs (d)(3) through (d)(6) of
this section in determining the
weight to give the opinion. We will
always give good reasons in our
notice of determination or decision
for the weight we give your treating
source's opinion.

(i) *Length of the treatment
relationship and the frequency of
examination.* Generally, the longer a
treating source has treated you and
the more times you have been seen by
a treating source, the more weight we
will give to the treating source's
medical opinion. When the treating
source has seen you a umber of times
and long enough to have obtained a
longitudinal picture of your
impairment, we will give the source's
opinion more weight than we would
give it if it were from a non
treating source.

(ii) *Nature and extent of the
treatment relationship.* Generally,
the more knowledge a treating source
has about your impairment(s) the more
weight we will give to the source's
medical opinion. We will look at the
treatment the source has provided and
at the kinds and extent of
examinations and testing the source
has performed or ordered from

50

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

specialists     and     independent
laboratories.

(3) *Supportability*.  The more a medical source
presents relevant evidence to support an opinion
particularly   medical   signs   and   laboratory
findings, the more weight we will give that
opinion. . . .

(4) *Consistency*. Generally, the more consistent
an opinion is with the record as a whole, the
more weight we will give to that opinion.

(Emphasis added.)

It bears repeating that this Court agrees with the ALJ's

conclusion that Dr.  Boyce's opinion was not supported by medically

acceptable clinical and laboratory diagnostic techniques and was not

consistent with the other substantial evidence in the record. That

evidence includes: 1) Dr. Sabio's findings that Roby possessed

"normal muscle strength in all four extremities" and that the

"neurological examination was normal"; 2) the opinion of a physician

from the Braxton Community  Health Center that Roby's fine motor

ability, gross motor ability, joints of all extremities, muscle

bulk, and motor strength were normal; and 3) and the opinions of two

state-agency physicians that Roby could occasionally lift and/or

carry fifty (50) pounds, frequently lift and/or carry twenty-five

(25) pounds and has the necessary physical residual functional

capacity to perform work.

Accordingly, the Magistrate Judge correctly determined that the ALJ appropriately evaluated and weighed all of the evidence of record prior to making the RFC decision.

G.   Hypothetical Question to VE

Roby contends that "[t]he ALJ relied upon an incomplete and inadequate hypothetical question to the VE and ignored favorable testimony of the VE ruling out all work on the basis of mental limitations identified by the examining psychologist and physical limitations identified by the treating physician in violation of the Commissioner's regulations and the law of the circuit."

The purpose of examining a vocational expert is to assist the ALJ in determining whether there is work available in the national economy that the claimant can perform. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, Chester v. Mathews, 403 F.Supp. 110 (D.Md.1975), and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments. Stephens v. Secretary of Health, Education and Welfare, 603 F.2d 36 (8th Cir.1979).

After determining that Roby could not return to his past relevant work, the ALJ posed questions to the VE at the

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

administrative hearing regarding whether there was work available in

the regional and national economy that Roby could perform based on

his RFC. According to the ALJ,

> . . . he [Roby] is able to lift up to 50 pounds
> of weight and engage in a good deal of standing,
> walking, and sitting; perform jobs not requiring
> good depth perception or good peripheral vision;
> work not requiring driving or traveling as part
> of the job; jobs allowing him to change
> positions briefly for one to two minutes at
> least every hour; jobs not requiring reading or
> writing above a third grade level; jobs not
> involving significant workplace hazards such as
> heights or dangerous moving machinery; unskilled
> jobs involving simple one to three step job
> tasks; jobs not involving work with the general
> public or close interaction with co-workers or
> supervisors; jobs not involving fast-paced or
> assembly line work; modestly flexible work
> without hard deadlines or quotas; jobs allowing
> for up to two days absent per month; and jobs
> with initial supportive supervision.

Based on this RFC, the ALJ posed the following hypothetical to the

VE:

> If we assume a person of the same age, education
> and work experience as the claimant, but assume
> a person who is capable of doing medium work as
> that's defined in the Commissioner's
> regulations, but there would be a number of
> additional limitations.  There would be no, no
> requirement for good depth perception.  No good
> peripheral vision.  No driving or travel as part
> of the job.  The person should be able to change
> positions for a minute or two at least every
> hour.  The person should not have to, there
> should be no requirement for reading more than

53

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

> fourth grade level or writing more than third
> grade level.  And no work around significant
> workplace hazards like heights or dangerous
> moving machinery.  And the job should involve a
> simple one to three-step tasks with no work with
> the general public, no close interaction with
> supervisors or coworkers, and no fast pace or
> assembly line work.  And what kind, let me just
> ask you a question.  In your opinion, what kinds
> of things are parts of unskilled work that cause
> additional stress to most people? . . . As a
> Vocational Expert, if you are looking to place
> somebody in a low stress job, what would you say
> would be the kinds of things you'd want to
> avoid? . . . [L]et me add to what I've already
> said.  There should be no, no hard deadlines or
> quotas in the job.  The job should be more
> flexible, although the person could still meet
> work capabilities in terms of doing a job.  But
> there shouldn't be like a hard deadline like so
> much done every hour, that kind of thing.  A
> person should be able to miss up to two days of
> work per month and that there should be initial
> supportive supervision, but then they'd be able
> to do the job.  Would there be any jobs such a
> person could do at the medium or light levels?

Based on this hypothetical, the VE responded:

> Yes, Judge.  There would be the work of a
> commercial cleaner. There would be, in the local
> and regional economy 2,330 jobs classified as
> medium and 256 jobs classified as light in the
> local and regional economy. And in the national
> economy there would be 267,600 classified as
> medium and 254,500 classified as light. There
> would be the work of an equipment washer. in the
> local/regional economy there would be 169 jobs
> classified as medium and 101 jobs classified as
> light.

. . .

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

In the national economy there would be 136,000 classified as medium and 59,350 classified as light. There would be the work of a mail clerk. In the local/regional economy there would be 39 jobs classified as light and in the national economy 51,300 classified as light. There would also be the work of a housekeeping cleaner. In the local/regional economy that would be classified as light. There would be 341 jobs in the local/regional economy and 254,550 classified as light in the national economy. That would be all, your Honor.

In his hypothetical question, the ALJ included Roby's 1) vertebrogenic disorder by including position changes, no driving, no travel, hazard limitations, and flexibility; 2) left eye blindness by including no visual depth perception, no peripheral vision, no driving, and avoidance of heights or dangerous moving machinery; and 3) depression and anxiety by including no reading above a fourth grade level, no writing above a third grade level, simple one to three-step tasks, no work with the general public, no close interaction with supervisors or coworkers, no fast pace or assembly line work, no hard deadlines, no quotas, flexibility, absences of up to two days per month, and initial supportive supervision. He did not include Roby's type 2 diabetes based on his determination that this disease caused Roby "no significant problems."

Roby's counsel asked the VE the following hypothetical:

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

> All right. If I add to the hypothetical that
> not only does this person need to have a
> sit/stand option, but that this person is
> going to need to have the option to take
> breaks as needed. Now as a matter of fact, we
> know what some of these breaks would be used
> for, but I think for vocation purposes you
> just need to know that this person would have
> to have the option to take breaks as needed
> and that up to one-half the time that this
> would involve more breaks than normally
> provided. This would be due to pain. This
> would also be due to the person's mental
> dysfunction due to pain and the need to simply
> physically rest. What, if any impact would
> that have on these jobs that you've
> identified?"

The VE replied "I think it would preclude all employment".

Although Roby contends the ALJ ignored this testimony, the ALJ concluded that these limitations were not supported by the evidence of record.

Counsel also asked the VE:

> Could I ask you if I add to the hypothetical
> instead of this last assumption that the
> person is limited in lifting to ten pounds,
> what, if any, impact would that have on the
> jobs that you've identified?"

The VE responded, stating, ". . . I would say there is a good, well, it would probably preclude the light jobs. . . . The ones I identified, the light ones. . . . It definitely would preclude them [medium jobs], too, yes."

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Roby contends the ALJ also ignored this testimony. The ALJ, however, did not ignore it; again, he concluded that the evidence of record did not support this limitation.

In <u>Lee v. Sullivan</u>, 945 F.2d 687, 692 (4th Cir. 1991), the Fourth Circuit noted that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record." Accordingly, substantial evidence in the record supports the Magistrate Judge's determination that the ALJ properly treated the VE's responses to the hypothetical questions from counsel.

### VII. <u>CONCLUSION</u>

After examining all of Roby's objections, the Court finds that he has not raised any issues that were not thoroughly considered by Magistrate Kaull in his report and recommendation. Moreover, after an independent <u>de</u> <u>novo</u> consideration of all matters now before it, the Court is of the opinion that the Report and Recommendation accurately reflects the law applicable to the facts and circumstances in this action. Therefore, it is

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

**ORDERED** that Magistrate Kaull's Report and Recommendation be, accepted in whole and that this civil action be disposed of in accordance with the recommendation of the Magistrate.  Accordingly,

1.   the defendant's motion for Summary Judgment (Docket No. 12) is **GRANTED;**

2.   the plaintiff's motion for Summary Judgment (Docket No. 11) is **DENIED;** and

3.   this civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment order.  Fed.R.Civ.P. 58.

The Clerk of the Court is directed to transmit copies of this Order to counsel of record.

DATED: August _____*29*_____, 2005.

IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE